COMMONWEALTH *vs.* KEVIN BRANCH.

No. 96-P-549.

Suffolk. December 6, 1996. - January 31, 1997.

Present: ARMSTRONG, KAPLAN, & LENK, JJ.

*Joint Enterprise. Evidence,* Joint enterprise. *Practice, Criminal,* Instructions to jury.

Evidence at the trial of indictments for armed assault with intent to murder and assault and battery by means of a dangerous weapon supported the defendant's convictions either as a principal or on a theory of joint venture, and there was no basis in the record for the judge to have given a requested instruction on withdrawal or abandonment from a joint venture. [184-185]

INDICTMENTS found and returned in the Superior Court Department on September 28, 1994.

The cases were tried before *Peter M. Lauriat,* J.

*Thomas M. Glynn* for the defendant.

*Kristine Luongo Tammaro,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The defendant Kevin Branch was tried in Suffolk Superior Court on indictments charging him with the crimes of armed assault with intent to murder (G. L. c. 265, § 18[b]), assault and battery by means of a dangerous weapon (G. L. c. 265, § 15A[b]), possession without a license of a firearm on his person or in a motor vehicle (G. L. c. 269, § 10[a]), and possession of ammunition without an I.D. card (G. L. c. 269, § 10[h]). When the Commonwealth rested, the defendant moved for a required finding of not guilty, which was denied. Thereupon the defendant rested. The jury found the defendant guilty of all four offenses. The sentences

imposed are noted in the margin.[1] The Commonwealth sought to prove the defendant's guilt on a theory of his participation in a joint venture as well as upon his direct responsibility. It will appear that the defendant's contention on this appeal is that the judge erred in failing to put to the jury the question whether the defendant had seasonably withdrawn from the joint venture.

## SUMMARY OF TESTIMONY

*Lorenzo Jones testified*: About noon, August 4, 1994, Lorenzo Jones encountered Rasheed Fountain, whom he had known for some eight years. Fountain was looking for a lift to Dudley Street (in the Roxbury section of Boston) where he might buy sneakers. Jones did not accommodate Fountain at that time, but around six o'clock that evening Fountain, now accompanied by Kevin Branch (the defendant), only slightly known to Jones, met Jones at the corner of Fayston and Mascoma Streets. The two boarded Jones's rental car, a Ford Tempo. As the party set out, Fountain said the money was at his house, and Jones accordingly drove to Fountain's place on Magnolia Street. Fountain and the defendant left the car, entered the apartment building, emerged in five minutes, and got into the car. As before, Fountain took the front passenger seat, the defendant the rear passenger seat.

Very soon, as the car was headed to the corner of Mascoma and Greenheys Streets, Fountain with his right hand drew a revolver from his waist and held it to Jones's right side. At the same time he ordered Jones to "run him off" Jones's jewelry. Jones refused. Instantly the defendant from the rear seat shouted, "Shoot that motherfucker, shoot that motherfucker." Fountain told Jones to stop the car; Jones did so near the corner. The defendant stepped out, and after some abusive argument Fountain also left the car. Jones started to drive toward Fayston Street. In his rear mirror he saw Fountain pointing the gun at the car. With the car still moving, Fountain fired four shots. Severally these struck the trunk of the car, shattered the rear window, grazed Jones's

---

[1]Four to seven years at Cedar Junction for the armed assault with intent to murder, concurrent one to three years for firearm possession, and five years' probation from and after release from commitment for the assault and battery by means of a dangerous weapon. The conviction of possession of ammunition was placed on file.

shoulder, and hit him in the back but without penetrating his body — the slug was caught in his shirt. The defendant was on the corner of Mascoma walking away toward Greenheys as Fountain fired the weapon. In shock, Jones continued to drive and on Fayston Street jumped from the car and ran some paces up that street. Thereafter an ambulance came and he was taken to a hospital from the site of his damaged car.

*Gary C. Yancey*: Yancey and Robert Ventullo of the New World Security force (special police officers) were idling on Greenheys Street, Yancy outside their vehicle, Ventullo within. They heard the gunshots and within seconds saw the defendant and Fountain running toward them. The defendant — identified as the shorter of the two, lean, with a big Afro hairdo, wearing all black[2] — held a gun in his hand. Yancy drew his weapon, as did Ventullo, who had come up; Yancy called on the men to freeze. Stopping for a moment, the defendant put his gun down his waistband, then the two suspects changed direction and, moving to their right across Greenheys, entered an empty lot there. Ventullo pursued the men on foot. Yancey made for Lawrence Avenue intending to intercept the men there. As he ran he radioed his dispatcher, which would inform all nearby units. The men were not on Lawrence Avenue. Yancey went on to Intervale Avenue, where he was picked up by a security car.

*Robert Ventullo*: Ventullo heard the gunshots, saw the men running up Greenheys Street toward Yancey and himself, and drew his weapon, with the result also observed by Yancey. He described the man with the gun as the shorter and leaner of the two, Afro hair style, clothed all in black — the defendant now in court. Ventullo followed the pair through the field off Greenheys Street and then through backyards and over a couple of fences. The defendant threw his gun as he went over the second fence. Finally the men, with Ventullo still in pursuit, reached and came to a halt in the Ceylon Street park. As Ventullo came abreast, he saw that security officers had apprehended the men and had them against a fence near the baseball field. Ventullo took part by frisking Fountain: no weapon found. Boston police took the defendant and Fountain in custody.

*Other testimony* by sundry witnesses described the finding

---

[2]Fountain had a muscular build and wore green.

by police after short search of the abandoned weapon, a rusted .38 calibre handgun. According to ballistics analysis this was the gun used in the firing at Jones's car.

## QUESTION OF WITHDRAWAL FROM JOINT VENTURE

The judge denied the defendant's motion for a required finding of not guilty and the defendant does not contend that that was a mistake. Such a contention would be vain, for the record as made supports the convictions on the bases mentioned of both accessorial[3] and direct responsibility. The defendant argues, instead, that the judge was mistaken when he denied a request for a jury instruction about the defendant's claimed "withdrawal" from the enterprise before its outcome in the commission of crime.

The evidence the defendant pointed to as fastening a duty on the judge to give the instruction consisted of Jones's observation that the defendant was moving away from the car toward Greenheys Street when Fountain fired the weapon. Let us suppose that the walking began before the shots were fired, as the defendant wants us to imagine. Centering attention on the charge of armed assault with intent to murder, the defendant says the crime was consummated when the shots were fired, and so the "withdrawal" was timely. To the contrary, the Commonwealth says that the crime was completed inside the car when Fountain with the defendant's enthusiastic encouragement assaulted Jones with the weapon; the firing would then appear merely as additional proof of the necessary criminal intent, citing *Commonwealth* v. *Slaney,* 345 Mass. 135, 138 (1962), *Salemme* v. *Commonwealth,* 370 Mass. 421, 424 (1976), and *Commonwealth* v. *Lopez,* 383 Mass. 497, 500 (1981). But on the defendant's own hypothesis of the sequence of events, the so-called withdrawal or abandonment still conformed not at all with the standard definition of the term (or its grounding in reason and policy) as

---

[3]"There are cases where such liability [in joint venture] arises without prior planning or agreement. So it has been held enough that at the climactic moments the parties consciously acted together in carrying out the criminal endeavor, each thereby becoming responsible for the acts of the others. An element of mutual assent at those moments no doubt there is, but there need not have been an anticipatory compact." *Commonwealth* v. *Fidler,* 23 Mass. App. Ct. 506, 513 (1987).

set out recently in *Commonwealth* v. *Cook*, 419 Mass. 192, 202 (1994):[4]

> "In order to support a theory of withdrawal or abandonment of a joint venture, 'there must be at least an appreciable interval between the alleged termination and [the commission of the crime], a detachment from the enterprise before the [crime] has become so probable that it cannot reasonably be stayed, and such notice or definite act of detachment that other principals in the attempted crime have opportunity also to abandon it.' "

In no view of the present case was there an "appreciable interval" with reasonable opportunity for Fountain to abandon the venture; the defendant's steps toward Greenheys Street rather figured as the start of a flight from the scene of the crime, in which Fountain promptly joined. The defendant, having in the car urged Fountain to "shoot the motherfucker," gave no "notice" by word of mouth to his coventurer of his "detachment" from the scheme, and the "act" of walking could hardly serve as such notice. The defendant's claim of withdrawal is an unreal construct. The judge was not bound to give an instruction, for there was no basis in the record for it: the evidence did not "raise[] a reasonable doubt as to whether the defendant continued to be part of a joint venture," which would cast on the Commonwealth "the burden of proving beyond a reasonable doubt the absence of abandonment." *Commonwealth* v. *Fickett*, 403 Mass. 194, 201 n.7 (1988). See also *Commonwealth* v. *Cook*, 419 Mass. at 201-202; *Commonwealth* v. *Joyce*, 18 Mass. App. Ct. 417, 426-430 (1984).

*Judgments affirmed.*

---

[4]Quoting from *Commonwealth* v. *Fickett*, 403 Mass. 194, 201 (1988), which quoted from *Commonwealth* v. *Green*, 302 Mass. 547, 555 (1939).