## Commonwealth *vs.* Wayne Miranda.

Bristol. April 6, 2010. - September 27, 2010.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, & Gants, JJ.

*Homicide. Witness,* Fee, Credibility. *Due Process of Law,* Conduct of prosecutor. *Gratuity Statute. Evidence,* Joint enterprise. *Joint Enterprise. Accessory and Principal. Practice, Criminal,* Argument by prosecutor, Instructions to jury.

At a criminal trial, the payment of consideration to two witnesses in exchange for their testimony, contingent on the defendant's conviction, did not violate the defendant's due process rights, where the defendant's attorney was informed prior to trial about the consideration, which was paid to and promised to the witnesses pursuant to a reward program sponsored by a third party (a local chamber of commerce); where, at trial, the defendant's attorney was permitted to (and did) cross-examine the witnesses on the issue; where the judge instructed the jury on their duty to assess the witnesses' credibility with particular care; and where there was no suggestion that either the chamber of commerce or the prosecutor was sponsoring or suborning perjury [105-111]; similarly, payments to the witnesses pursuant to the reward program did not pose a fundamental problem of fairness that would amount to structural error [111].

Statement that, in the future, prosecutors may not provide (or participate in providing) monetary awards to witnesses contingent on a defendant's conviction. [111-112]

A criminal defendant could not use an alleged violation of the gratuity statute, G. L. c. 268A, § 3 (*c*) and (*d*), in a collateral attack on his conviction and to exclude witness testimony. [112-113]

At a murder trial, the evidence was sufficient to warrant a finding that the defendant acted either as a principal or as a joint venturer. [113-114]

In closing argument at a criminal trial, the prosecutor did not improperly shift the burden of proof to the defendant or suggest that there was evidence that could not be heard because witnesses feared the defendant [114-116]; further, certain remarks by the prosecutor, which emphasized how the accounts of two witnesses, in the main, were consistent and corroborated each other, did not constitute improper direct comment on the defendant's failure to contradict testimony [116-117].

The evidence at a murder trial did not warrant an instruction on withdrawal from a joint venture, and there was no error in its omission or in defense counsel's failure to request it. [117-118]

Indictments found and returned in the Superior Court Department on November 18, 2005.

The cases were tried before *E. Susan Garsh*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Robert F. Shaw, Jr.*, for the defendant.

*Rachel J. Eisenhaure*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. In July, 2008, the defendant, Wayne Miranda, was convicted of murder in the second degree,[1] assault and battery by means of a dangerous weapon (a firearm), and unlawful possession of a firearm. Represented by new counsel, he appeals from these convictions, claiming (1) that reversal is required because two witnesses at trial were paid consideration for their testimony contingent on his conviction; (2) error in the denial of his motion for required findings of not guilty; (3) prejudicial error in the prosecutor's closing argument; and (4) that the judge erroneously failed to instruct the jury on withdrawal from a joint venture. We granted the defendant's application for direct appellate review. Although we conclude that a prosecutor cannot participate in an offer of payments to fact witnesses for testimony contingent on the outcome of litigation, we reject the defendant's claims and affirm the convictions.

Based on the Commonwealth's evidence, the jury could have found the following facts. Shortly after receiving a dispatch at 8:32 P.M., on October 10, 2005, concerning "shots fired," police discovered Christopher Barros lying on the ground by a picket fence in the back yard of 40 Russell Street in New Bedford. The victim had been shot twice and had an "L" shaped laceration on one of his hands. He was transported to a hospital. He died as a result of one of the gunshot wounds.

Three witnesses, Kim Deann Reis, John G. Andrade, and Carmen Rodriguez, observed events that immediately preceded the shooting but did not see the shooting itself. Reis did not give a formal statement to police until two years after the event

---

[1] The defendant was indicted on a charge of murder in the first degree, and at trial the Commonwealth proceeded against him on the theory of deliberate premeditation based on both principal and joint venture liability. On the charge of murder in the second degree, the Commonwealth also proceeded against the defendant on both principal and joint venture liability. In returning a guilty verdict of murder in the second degree, the jury did not specify whether they found the defendant guilty individually or as a joint venturer.

because she was "scared." She agreed to testify at trial in exchange for financial assistance in relocating and in exchange for consideration with respect to an unrelated drug charge. Andrade and Rodriguez each spoke with police immediately following the shooting. Subsequently, and before the defendant's trial, each was paid $3,000 by the New Bedford Area Chamber of Commerce pursuant to a reward program it sponsored. The $3,000 payment was given in return for information Andrade and Rodriguez respectively provided that helped lead to the defendant's indictment.[2]

With respect to the events that preceded the shooting, an argument between the victim and the defendant's older brother, Fagbemi Miranda (Fagbemi),[3] first drew the attention of nearby residents. It took place on Purchase Street, in front of the apartment building in which Reis resided.[4] Reis had known the defendant and Fagbemi, and recently had been introduced to, and spent time with, the victim. On the sidewalk, near Fagbemi and the victim, Reis saw a male standing near a tan automobile.

Andrade and Rodriguez, who were in Rodriguez's fourth floor apartment on Bedford Street near the corner adjoining Purchase Street, also heard an argument outside. From a window overlooking Purchase Street, they observed Fagbemi, whom they knew, arguing with a man they did not know (the victim). They also observed another man who was on the sidewalk next to a black automobile.[5]

A few minutes later, the defendant left his house and joined in the argument between Fagbemi and the victim. He then went back inside his house. Soon thereafter, the defendant came back

[2]Further details concerning the reward program will be discussed *infra*.

[3]There was testimony that the defendant was shorter and thinner than his brother, Fagbemi Miranda (Fagbemi).

[4]The defendant resided in a house located diagonally across the street from the home in which Kim Deann Reis lived. He lived with Fagbemi, his mother (Cecelia Miranda), his grandmother (Pauline Miranda), and his cousin (Wallace Miranda).

[5]The victim drove a black Dodge Intrepid automobile. John G. Andrade testified that the black automobile he saw the unknown man standing near looked similar to the victim's automobile as depicted in a photograph. From a photographic array displayed to him on October 12, 2005, Andrade identified a photograph of Casey DePina, a friend of the victim's, as resembling the man near the black automobile.

out of his house holding a black gun.[6] His grandmother followed him, attempting to prevent him from leaving and trying to get him to return inside. The defendant jumped over the railing on the porch of the house, went over to the victim, and aimed the gun at him.

Reis heard the victim say, "Are you serious, Waynie? Are you serious? It's like that? It's like that?" Andrade and Rodriguez observed the victim raise his arms up and Andrade heard the victim say, "No," when the defendant pointed the gun at him. Andrade testified that Fagbemi walked over to the defendant saying, "No, no, no." The victim took off running up Purchase Street and then turned down Reis's driveway.[7] The defendant ran after the victim, followed by Fagbemi, and next by the man who had been standing near the tan or black automobile. Reis, from a window, yelled to the defendant to think of his daughter.

The accounts vary on what next took place. Reis, who had a limited view from her position, testified that the defendant stopped running at the end of her driveway where the driveway met the back yard. Fagbemi caught up to the defendant and the two exchanged words.[8] Reis saw the defendant hand the gun to Fagbemi, saw Fagbemi raise his arm and point the gun toward the direction of a fence in her back yard, and then heard two gun shots. She dialed 911.

Andrade and Rodriguez, who also had a limited view, heard two shots after the men went down Reis's driveway. They did not see the defendant hand the gun over to anyone else. After hearing the shots, Andrade dialed 911.[9] Andrade and Rodriguez saw the defendant and Fagbemi leave the driveway. As they were leaving, Andrade saw one of the Miranda brothers pass the gun to the other, but could not say which one passed the gun or

[6]Andrade, a former member of the United States Marine Corps, observed that the gun was approximately eight to ten inches in length, and was not a revolver.

[7]The back yard of Reis's home adjoined the back yard of 40 Russell Street, where the victim was found.

[8]During her cross-examination, Reis testified that previous testimony she had given under oath, that she had not seen the defendant and Fagbemi say anything to each other when they were in her driveway and back yard, was a lie.

[9]Andrade was impeached with a tape recording of his 911 call during which he was heard telling Rodriguez that his nephew had a gun.

which one received the gun.[10] Andrade and Rodriguez watched as the defendant and Fagbemi returned to their house. The other man returned to the automobile that he previously had been standing near and left in it.

From Reis's driveway, police recovered two nine millimeter discharged cartridge casings that were manufactured by Remington Peters. No weapon was recovered. The Commonwealth's firearms identification expert gave his opinion that, based on his microscopic examinations, the discharged cartridge casings were fired from the same weapon. Particles of gunshot powder residue were detected on Fagbemi's hands.[11] Police found papers belonging to the victim and to Casey DePina inside the victim's automobile.

The defendant spoke with police on the night of the shooting at a police department. He agreed to speak with them after first being advised of his Miranda rights and after being informed that the interview was going to be recorded. The defendant denied any involvement in the shooting. He stated that he had heard shots but had been inside his home working on his computer.

The defendant did not testify at trial. His trial counsel attacked the credibility of Reis, Andrade, and Rodriguez in various ways, including bringing out the fact that each received some form of consideration, including monetary consideration, in exchange for their testimony. Also, through the cross-examination of Andrade and several police witnesses, the defense suggested that others may have perpetrated the shooting, and that the prosecution's investigation was faulty for not properly investigating these other possibilities.[12] It was brought out that Andrade's son, Tyson De-Pina, was an associate of Brandon Gonsalves, both of whom (along with others) were indicted in Federal court on drug charges. Gonsalves had been the target of a Federal wiretap and was recorded before the victim's shooting as warning that persons

---

[10]During his cross-examination, Andrade was impeached with prior recorded testimony in which he stated that he saw the defendant leave the driveway holding a gun, and in which he made no mention of any gun being passed between the Miranda brothers.

[11]Gunshot powder residue evidence detected on the defendant was suppressed prior to trial. There was testimony that gunshot powder residue may be transferred from a firearm to another surface.

[12]The victim was known to police as a person who had sold drugs.

should stay away from the victim and out of the victim's automobile because he had received "too many passes." Gonsalves and Tyson DePina were indicted, as well as a man having the first name "Craig," which police learned was the same name as an individual who had tried to shoot the victim approximately one week before October 10, 2005. Andrade was recorded during the wiretap after October 10, 2005, using Gonsalves's telephone to call Tyson DePina. Andrade spoke of the victim's shooting and said that Casey DePina drove the automobile at the scene.

The defendant's trial counsel called three witnesses: the defendant's grandmother, who testified that he was home working on the computer at the time of the shooting, and two childhood friends of the defendant, who testified that in the hours preceding the shooting, they had installed carpet at the defendant's home and saw the defendant there. In support of his defense of misidentification, the defendant's trial counsel called Geoffrey Loftus, a professor of psychology at the University of Washington in Seattle. Dr. Loftus testified concerning the process and quality of memory, and factors that can interfere with the ability to perceive and to recollect.

1. *Payments to witnesses.* As has been stated, before trial, Andrade and Rodriguez received monetary consideration, namely $3,000 each, from the chamber of commerce pursuant to its reward program for information each provided that helped lead to the defendant's indictment. Under the program, the chamber of commerce would pay $3,000 for information that helped lead to an indictment in an unsolved homicide, and an additional $2,000 if the information provided led to a conviction. The office of the district attorney did not indorse the program, provide any funding, or participate in the decision-making process regarding whether payment should be made. The chamber of commerce, however, conditioned payment on receipt of a letter from the district attorney's office (which the prosecutor provided for Andrade and Rodriguez) stating that a particular person did provide information in connection with a specific unsolved homicide that led to indictment, conviction, or both (verification letter).[13] Thus, at the time of the defendant's trial, the prospect

---

[13]The letters provided by the prosecutor to the New Bedford Area Chamber

of Andrade's and Rodriguez's receipt of an additional $2,000 was conditioned on the outcome of the prosecution of the defendant, that is, conditioned on his conviction.[14] The defendant claims that, by providing a verification letter to the chamber of commerce, the prosecutor "knowingly participated in facilitating cash payments to [his] own witnesses, contingent upon outcomes." He argues that the circumstances in which these payments were made amounts to structural error and violated his Federal and State due process rights. He also contends that the testimony was procured unethically and in violation of the gratuity statute, G. L. c. 268A, § 3 (*c*) and (*d*). Consequently, the defendant seeks a new trial in which the testimony of Andrade and Rodriguez would be excluded.

As an initial matter, for purposes of this opinion we assume that a prosecutor's provision of verification letters after a defendant's conviction (in this case, for example, so that Andrade and Rodriguez would be given an additional $2,000 each) amounts to the indirect provision of money to fact witnesses contingent on the outcome of a defendant's trial. "The common law at one time disqualified from testifying all parties and others with any pecuniary or proprietary interest in the outcome of a suit." 27 C.A. Wright & V.J. Gold, Federal Practice and Procedure § 6005, at 69 (2007). Parties and fact witnesses with a financial interest in the outcome of litigation were disqualified from testifying because it was thought that such witnesses would be inclined to commit perjury. *Id.* This viewpoint was rejected by scholars in the Nineteenth Century, see *id.*, although the common-law proscription continues to be reflected in various criminal bribery or gratuity statutes. See Harris, Testimony for Sale: The Law and Ethics of Snitches and Experts, 28 Pepp. L. Rev. 1, 9-12 & nn. 67, 69 (2000). In addition, some jurisdictions have condemned altogether the practice of payments to fact witnesses even where the payment was not contingent on the outcome of a case, or permit only the payment of reasonable expenses such as travel or time, declaring other payments unethical. See, e.g., *Golden Door*

of Commerce do not appear in the record, but there was testimony and cross-examination concerning the existence and substance of the letters.

[14]There was evidence at trial that Andrade and Rodriguez each expected to receive another $2,000 after trial if the defendant was convicted.

*Jewelry Creations, Inc.* v. *Lloyds Underwriters Non-Marine Ass'n,* 865 F. Supp. 1516, 1523-1525 (S.D. Fla. 1994) (holding in *civil* case that payment to fact witness for truthful testimony did not violate Federal bribery statute but did violate Florida rules of professional conduct for lawyers); *Florida Bar* v. *Jackson,* 490 So. 2d 935, 936 (Fla. 1986) (lawyer committed ethical violation for attempting to have party in *civil* case pay inducement to potential witnesses); *In re Howard,* 69 Ill. 2d 343, 351 (1977) (lawyer who paid police officer for testimony at trial committed ethical violation regardless of intent to induce truthful or untruthful testimony).[15] See Rule 3.4(b) of the American Bar Association (ABA) Model Rules of Professional Conduct (6th ed. 2007) ("A lawyer shall not: . . . falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law")[16]; Restatement (Third) of the Law Governing Lawyers § 117 (2000) (prohibiting compensation to fact witnesses "in excess of the reasonable expenses of the witness incurred and the reasonable value of the witness's time spent in providing evidence").

The defendant correctly points out that our own professional rules of conduct prohibit the practice of compensating fact witnesses beyond their time lost and for expenses reasonably incurred in attending or testifying. Under the Massachusetts Rules of Professional Conduct,

"A lawyer shall not: . . .

"(g) pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his or her testimony or the outcome of the case. But a

---

[15]Compensation to fact witnesses is said to violate the integrity of the judicial system, to undermine the proper administration of justice, and to be contrary to a witness's "solemn and fundamental duty to tell the truth." *Golden Door Jewelry Creations, Inc.* v. *Lloyds Underwriters Non-Marine Ass'n,* 865 F. Supp. 1516, 1526 (S.D. Fla. 1994).

[16]Comment [3] to Rule 3.4 of the American Bar Association (ABA) Model Rules of Professional Conduct (6th ed. 2007) provides, "With regard to paragraph (b), it is not improper to pay a witness's expenses or to compensate an expert witness on terms permitted by law. The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying and that it is improper to pay an expert witness a contingent fee."

lawyer may advance, guarantee, or acquiesce in the payment of:

"(1) expenses reasonably incurred by a witness in attending or testifying

"(2) reasonable compensation to a witness for loss of time in attending or testifying

"(3) a reasonable fee for the professional services of an expert witness . . . ."

Mass. R. Prof. C. 3.4 (g), 426 Mass. 1389 (1998).[17] Contrary to the rule in some jurisdictions and the apparent practice in the Federal courts, we expressly disapprove of that aspect of the prosecutor's involvement in the reward program that was conditioned on a conviction. Whether in this case the prosecutor's involvement violated rule 3.4 (g) is a determination, if it is to be made (for there has been no previous guidance on the issue), for the Board of Bar Overseers (board) in the first instance. However, even if the board were to conclude that the prosecutor's involvement in this reward program was unethical (again, we do not suggest that the board undertake any investigation in this case), that decision may not be used collaterally to attack the defendant's conviction; the board's decision would have no bearing on the defendant's claims that the prosecutor's conduct amounted to structural error and violated his due process rights.

Contrary to the defendant's claim, we conclude that there is no Federal or State due process violation in this case. Federal courts considering whether a fact witness may be paid for his or her testimony when payment is contingent on the content of the testimony or the outcome of the case have analyzed the issue in terms of witness competency and due process. See 27 C.A. Wright & V.J. Gold, Federal Practice and Procedure, *supra* at § 6005, at 69-70 & n.86. See also *United States* v. *Davis*, 261 F.3d 1, 38 (1st Cir. 2001). In terms of witness competency, pecuniary interest in the litigation is an "acceptable basis for

---

[17]Our rule does not prohibit prosecutors from providing something of value to a witness in exchange for the witness's testimony founded on a promise of truthful cooperation. See, e.g., *Commonwealth* v. *Sullivan*, 410 Mass. 521, 523-524 (1991) (promise of dismissal); *Commonwealth* v. *Ciampa*, 406 Mass. 257, 259, 261 (1989) (promise of leniency); *Commonwealth* v. *DeBrosky*, 363 Mass. 718, 730 (1973) (grant of immunity).

attacking witness credibility, but . . . has been eliminated as a basis for disqualification." 27 C.A. Wright & V.J. Gold, Federal Practice and Procedure, *supra* at § 6005, at 69-70. See 2 J. Wigmore, Evidence § 577 (3d ed. 1940).

With respect to a defendant's due process rights, where the payment for a witness's testimony is not contingent on the outcome of the case, Federal courts have required four procedural safeguards to permit the witness to testify:

> "First, a witness-fee payment arrangement must be disclosed to each defendant against whom the witness will testify before the proceeding at which the witness testifies . . . . Second, the defendant must be afforded an opportunity to cross-examine the witness about the fee arrangement. Third, the court must instruct the jury about the heightened scrutiny to be given testimony provided under a fee payment arrangement. . . . And finally, there can be no indication that the government is sponsoring or suborning perjury." (Citations omitted.)

*United States* v. *Levenite*, 277 F.3d 454, 462 (4th Cir.), cert. denied, 535 U.S. 1105 (2002).[18] See *Hoffa* v. *United States*, 385 U.S. 293, 298, 310-312 (1966) (rejecting claim that government's use of informant who was compensated for his testimony violated defendant's due process rights; even though witness had motives to lie [State and Federal criminal charges pending against him that were dropped or not pursued after witness testified], procedural safeguards including cross-examination and comprehensive jury instructions properly guided jury in determining witness's credibility). Indeed, where procedural safeguards are in place, Federal courts considering the issue of payment to fact witnesses contingent on a witness's testimony "have almost always held that such payments present an issue of credibility to be resolved by the trier-of-fact, but do not affect competency" or result in a due process violation. 27 C.A. Wright & V.J. Gold, Federal Practice and Procedure, *supra* at § 6005, at 70 n.86. See *United States* v. *Davis*, *supra* (payment

---

[18]Where a payment to a witness is contingent on the outcome, additional safeguards are required. See *United States* v. *Levenite*, 277 F.3d 454, 462-463 (4th Cir.), cert. denied, 535 U.S. 1105 (2002). As we prohibit contingency-of-outcome payments, we need not consider these additional safeguards.

to witness for testimony did not render witness incompetent); *United States* v. *Cresta*, 825 F.2d 538, 545-547 (1st Cir. 1987), cert. denied sub nom. *Impemba* v. *United States*, 486 U.S. 1042 (1988) (testimony of informant who received significant payments and benefits admissible against defendants). The Federal courts have so held even where the payment was contingent on the outcome of the case. See, e.g., *United States* v. *Wilson*, 904 F.2d 656, 659 (11th Cir. 1990), cert. denied sub nom. *Bogus* v. *United States*, 502 U.S. 889 (1991) (government witnesses paid statutory reward for their testimony contingent on effect of testimony); *United States* v. *Spector*, 793 F.2d 932, 934, 936-937 & n.3 (8th Cir. 1986), cert. denied, 479 U.S. 1031 (1987) (witness given use immunity and consideration in form of money contingent on whether testimony resulted in successful prosecution); *United States* v. *Grimes*, 438 F.2d 391, 395-396 (6th Cir.), cert. denied, 402 U.S. 989 (1971) (government informer paid for testimony contingent on conviction of defendants); Hughes, Agreements for Cooperation in Criminal Cases, 45 Vand. L. Rev. 1, 25 (1992) ("the suggestion of some older cases that an agreement with a witness should only demand full and truthful testimony and should in no way be contingent on the success of the prosecution seems to have crumbled"). The procedural safeguards ensure that "no unnecessary barriers will be imposed on the [prosecutor's] ability to bargain for truthful testimony, and at the same time [will] ensure[] the jury will be able to determine what weight, if any, in light of all the evidence, to give to the witness's testimony." *State* v. *McGonigle*, 401 N.W.2d 39, 42 (Iowa 1987).

In analyzing the defendant's due process challenge, we adopt the Federal procedural safeguards and conclude that they were satisfied in this case. Here, there is no dispute that the defendant's attorney was informed prior to trial about the money paid to and promised to Andrade and Rodriguez pursuant to the reward program of a third party. At trial, the defendant's attorney was permitted to (and did) cross-examine these witnesses on the payments and expected payments, and the terms of receipt. He also cross-examined a witness who headed the rewards program. When Andrade and Rodriguez testified, the judge instructed the jury in each instance to scrutinize the testimony with "particular care"

because the reward was "contingent on there being a guilty verdict." The judge repeated this instruction in her final charge to the jury, which contained comprehensive instructions concerning witness credibility. Finally, there was no suggestion that the chamber of commerce or the prosecutor was sponsoring or suborning perjury. Other considerations bear on our conclusion, such as the fact that, in this case, the reward did not come directly from the prosecutor but, rather, from the chamber of commerce. Also, both Andrade and Rodriguez were competent to testify despite the payments and pending financial incentives, and were not facing the possibility of any type of criminal liability themselves as may be the case with some witnesses, such as accomplices or informants, cf. *Commonwealth* v. *Ciampa*, 406 Mass. 257, 258, 259 (1989) (consideration under plea agreement given to admitted accomplice in crime), which may present one with a greater incentive to lie. We add that, while there were some inconsistencies between the testimony provided by Andrade and Rodriguez, compared to that given by Reis, many details corroborated each other. In these circumstances, we reject the defendant's claim of a due process violation.

For these same reasons, we reject the defendant's contention that the existence of the reward program interferes with "the concept of ordered liberty," see *Palko* v. *Connecticut*, 302 U.S. 319, 325-326 (1937), or resulted in a proceeding whereby the "criminal trial [could not] reliably serve its function," *Sullivan* v. *Louisiana*, 508 U.S. 275, 281-282 (1993), thereby amounting to an error structural in nature. On this record, payments to Andrade and Rodriguez pursuant to the reward program simply do not pose a fundamental problem of fairness that would amount to structural error.

While the contingent monetary rewards in this case neither violated due process nor constituted structural error, we declare, exercising our superintendence authority, that prosecutors in the future may not provide (or participate in providing) monetary awards to witnesses contingent on a defendant's conviction. In so declaring, we recognize that, to prove the crime charged, prosecutors often need to procure the cooperation and truthful information or testimony of reluctant witnesses. The interests of justice, however, are not well served when a witness's reward is

contingent on the conviction of a defendant rather than the provision of truthful information or testimony.

As to the defendant's claim that there was a violation of the gratuity statute, G. L. c. 268A, § 3 (*c*) and (*d*),[19] like its Federal counterpart, 18 U.S.C. § 201(c)(2) and (3) (2006), provides an express mechanism for its enforcement, namely, criminal prosecution, imposition of a fine, or both. See note 19, *supra.* See also *Scaccia* v. *State Ethics Comm'n*, 431 Mass. 351, 355 (2000) (where language of Federal and Massachusetts gratuity statutes "virtually identical," it is permissible to look to Federal law in construing Massachusetts gratuity statute). Even if we were to assume that the Massachusetts gratuity statute would apply, but see *United States* v. *Lara*, 181 F.3d 183, 197 (1st Cir.), cert. denied, 528 U.S. 979 (1999) (Federal gratuity statute "does not apply at all to the federal sovereign qua prosecutor"), its violation may not be used collaterally to attack the defendant's conviction and to exclude testimony. See *United States* v. *Smith*, 196 F.3d 1034, 1040 (9th Cir. 1999), cert. denied, 529 U.S. 1028 (2000) (Federal gratuity statute provides enforcement mechanism and may not be transformed into exclusionary rule); *United States* v. *Lara, supra* at 198, and cases cited (appropriate

---

[19]Pursuant to St. 1962, c. 779, § 1, the version of the gratuity statute applicable to this case, G. L. c. 268A, § 3, provides, in pertinent part:

"(*c*) Whoever, directly or indirectly, gives, offers or promises anything of substantial value to any person, for or because of testimony under oath or affirmation given or to be given by such person or any other person as a witness upon a trial . . . before any court . . . or

"(*d*) Whoever, directly or indirectly, asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of substantial value for himself for or because of the testimony under oath or affirmation given or to be given by him or any other person as a witness upon any such trial, hearing or other proceeding, or for or because of his absence therefrom; shall be punished by a fine of not more than three thousand dollars or by imprisonment for not more than two years, or both.

"Clauses (*c*) and (*d*) shall not be construed to prohibit the payment or receipt of witness fees provided by law or the payment by the party upon whose behalf a witness is called and receipt by a witness of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing or proceeding . . . ."

penalty for violation of Federal gratuity statute is fine or imprisonment as prescribed by statute, not application of exclusionary rule).

2. *Sufficiency of the evidence*. The Commonwealth proceeded against the defendant on both principal and joint venture liability, and the jury returned a general verdict, finding the defendant guilty of murder in the second degree. The defendant moved for required findings of not guilty at the close of the Commonwealth's case and again at the conclusion of all the evidence, arguing that there was insufficient evidence to warrant a finding that he was the shooter, and thus acted as a principal. He makes this same argument on appeal. In addition, he contends that there was insufficient evidence of a joint venture because Fagbemi tried to stop the defendant.

In assessing the defendant's claims, we apply the well-established standard set forth in *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). Under that standard, the "question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Id.* at 677, quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979). Questions of credibility are to be resolved in the Commonwealth's favor, and circumstantial evidence is sufficient to establish guilt beyond a reasonable doubt. *Cramer* v. *Commonwealth*, 419 Mass. 106, 110 (1994). To the extent that conflicting inferences may be drawn from the evidence, it is for the jury to decide which version to credit. *Id.*

The defendant does not challenge the sufficiency of the evidence as to the elements of murder in the second degree. Rather, he claims that he could not have been convicted as a principal because there was insufficient evidence to warrant a finding that he had been the shooter.

In *Commonwealth* v. *Zanetti*, 454 Mass. 449, 468 (2009), we stated that, in an appeal following a conviction, we will "examine whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime, rather than examine the

sufficiency of the evidence separately as to principal and joint venture liability."[20] Thus, it does not matter who shot the victim. The jury reasonably could have inferred the defendant knowingly participated in the shooting by committing the shooting himself (crediting the testimony of Andrade and Rodriguez) or by supplying Fagbemi with the means to commit the shooting (handing him the gun), with the intent that Fagbemi do so (crediting Reis's testimony). The fact that the Commonwealth's evidence permitted alternate versions is not of legal significance so long as each version is legally supportable under the *Latimore* standard.

Concerning the efforts of Fagbemi to stop the defendant, to the extent that this evidence may have affected the defendant's intent, the defendant overlooks the critical timeline established by the Commonwealth's evidence, which places Fagbemi's initial protestations *before* the chase of the victim to Reis's home. Based on the Commonwealth's evidence concerning what transpired after the chase, the jury reasonably could have inferred, even if the defendant had not been the shooter, that he shared the requisite mental state for murder in the second degree and knowingly participated in the commission of the crime. See *Commonwealth* v. *Zanetti*, *supra* at 470 (Appendix). The judge correctly denied the defendant's motions for required findings.[21]

3. *Prosecutor's closing argument.* The defendant challenges portions of the prosecutor's argument. He failed to object at trial on the grounds he now raises. We therefore review his claims to determine whether there was error and, if so, whether it gave rise to a substantial risk of a miscarriage of justice. *Commonwealth* v. *Cifizzari*, 397 Mass. 560, 578 (1986). We consider these remarks "in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury." *Commonwealth* v. *Whitman*, 453 Mass. 331, 343 (2009).

The defendant first contends that the prosecutor improperly shifted the burden of proof to the defendant by suggesting in his

[20]Our recommended jury instruction is to be used in future cases and has no bearing on cases already tried. *Commonwealth* v. *Zanetti*, 454 Mass. 449, 467 & n.21, 470 (2009) (Appendix).

[21]The Commonwealth's position did not deteriorate after it closed its case. See *Commonwealth* v. *Basch*, 386 Mass. 620, 622 & n.2 (1982).

argument that there was evidence that could not be heard because of fear of the defendant. For instance, the prosecutor asked who was the fourth man who drove off in the victim's automobile and why had he not come forward,[22] and why had Reis taken so long to provide police with a formal statement.[23] In the context of the argument in its entirety and the evidence at trial, the remarks were permissible and did not reflect burden shifting.

The prosecutor did not expressly state or suggest that the "fourth man" was absent from trial because he feared the defendant. Rather, he noted the man's absence "for whatever reason" and then alluded to the need for the chamber of commerce's reward program. In context, the remarks suggested that witnesses are not cooperative with police, not that this witness did not come forward because of intimidation by, or fear of, the defendant. The subject matter was an appropriate one on which to comment because the jury had heard from Reis, Andrade,

---

[22]Concerning the "fourth man" the defendant claims the following remarks were improper:

"[W]e have also heard about this fourth man, the so-called driver of the car. . . . Apparently responsible for driving the car back to [the victim's] family's home. The act, I would submit, of a friend. Was it Casey DePina? I suppose we don't really know. Was it Barry Souto? I suppose we don't know. But where is that fellow?

"Casey DePina was interviewed by the police. Barry Souto you heard was interviewed for a short term until he closed the door on the police. Where is that fellow to tell the story about how his friend died? We're talking two and a half years later. Where is he? When you think about a friend not being able to come forward, for whatever reason, to talk about how his own friend died, you may have an idea of what [the former president of the chamber of commerce] was telling you when he said that the Chamber of Commerce that he ran had a reward program . . . established to try to solve unsolved homicides . . . . Again, I invite you to look at the evidence, please."

[23]As to Reis, the defendant argues impropriety in the following statements:

"[Reis] only came forward, as you recall, in December of last year. I suggest to you if she was showing signs of nervousness that night and that next morning, it had another cause [other than an investigation concerning drugs]. But I know you don't welcome that either. A reward, the arrangement, her being taken out of that neighborhood. Think, if you will, of that fourth person, that friend who we never heard from. Think about the event."

and Rodriguez that this other man had been present during the commission of the crime, and the defendant's trial counsel, in her closing argument, accused the police of having conducted a "shoddy investigation" and of ignoring evidence of other suspects. The prosecutor's hypothetical questions and statements concerning the "fourth man" were a fair response to this argument. They also had support in the record, as there was evidence that police attempted to identify and speak with the other man present on the night of the shooting but either received no cooperation or their efforts were to no avail. It is not improper for counsel to respond to arguments raised by the defense, see *Commonwealth* v. *Anderson*, 411 Mass. 279, 286 (1991), and to make an argument presented by way of reasonable inferences that could be drawn from the evidence, see *Commonwealth* v. *Ruiz*, 442 Mass. 826, 835 (2004).

Concerning Reis, the defendant's trial counsel attacked her credibility in her closing argument, calling Reis a "crack cocaine dealer" who "changes her story" and took years to come forward. The challenged remarks of the prosecutor were a fair response to this argument and had an evidentiary basis in the record. In addition to Reis's testimony that she delayed coming forward because she was scared, there was testimony from a police officer that he tried to speak with Reis the day following the shooting but could not obtain information from her because she was shaking, was stuttering, and was extremely nervous. Also, Reis testified that, on the day after the shooting, Fagbemi and Wallace approached her while she was on her way to work and exchanged words with her and, on another occasion, the defendant's mother approached her and made a statement to her. From this evidence, the jury reasonably could have inferred (although the prosecutor did not specify) that Reis was not forthcoming with police in a timely manner because she was scared on account of the crime itself, the defendant, the defendant's family members, or a combination of these factors. See *Commonwealth* v. *Pina*, 430 Mass. 266, 270 (1999). The remark concerning Reis was not improper.

The defendant next contends that the prosecutor improperly shifted the burden of proof to him by emphasizing in his closing "what the defense did not do at trial." Specifically, he

points to the prosecutor's narrow focus on the facts that Reis and Andrade were cross-examined as having been inconsistent concerning only one factual matter. The defendant examines these remarks in isolation. Taken in context, it is clear that the remarks were intended to demonstrate how the accounts of Reis and Andrade (and Rodriguez), in the main, were consistent and corroborated each other. In addition, the argument served as an attempt to show that the inconsistencies that did exist involved peripheral matters of no consequence.

To the extent that the remarks may have implied the unstated observation that, by contrast, the defendant left the balance of the Commonwealth's evidence from these witnesses uncontested, this indirect implication does not approach the sort of burden shifting that results from direct comment on a defendant's failure to contradict testimony. See, e.g., *Commonwealth* v. *Amirault*, 404 Mass. 221, 240 (1989) (prosecutor may not comment on defendant's failure to contradict testimony; prosecutor's closing argument improper where he claimed defendant "was unable to point to one single thing in the whole world that would account for why all these children and parents have turned against him"). Any potential for harm, however, was adequately cured by the judge's clear, strong, and correct instructions on the presumption of innocence; the Commonwealth's burden of proof; the considerations, including the existence of inconsistent statements and the impeachment or contradiction of some of a witness's testimony, involved in assessing witness credibility; and the fact that the closing arguments of counsel are not evidence. See *Commonwealth* v. *Cohen*, 412 Mass. 375, 389 (1992). In these circumstances, there is no substantial risk of a miscarriage of justice.

4. *Jury instructions.* We reject the defendant's contention that the judge erroneously failed to instruct the jury on withdrawal from a joint venture. Although the defendant did not request this instruction at trial, he argues that the judge nonetheless should have given it and that he was deprived of a substantial defense by his trial counsel's failure to request it. The defendant contends that the evidence was sufficient to warrant the instruction because the jury could have found that he withdrew from the joint venture when he stopped at the end of Reis's driveway

and handed over the gun to his brother, who had earlier "appeared to resist . . . escalation."

"Before a judge is required to give a requested instruction, there must be some basis in the evidence, viewed in the light most favorable to the proponent, supporting the requested instruction." *Commonwealth* v. *Cook*, 419 Mass. 192, 201 (1994), and cases cited. "In order to support a theory of withdrawal or abandonment of a joint venture, 'there must be at least an appreciable interval between the alleged termination and [the commission of the crime], a detachment from the enterprise before the [crime] has become so probable that it cannot reasonably be stayed, and such notice or definite act of detachment that other principals in the attempted crime have opportunity also to abandon it.' " *Id.* at 202, quoting *Commonwealth* v. *Fickett*, 403 Mass. 194, 201 (1988).

Here, there was no evidence that the defendant announced or notified his brother that he intended to withdraw. See *Commonwealth* v. *Cook, supra*; *Commonwealth* v. *Branch*, 42 Mass. App. Ct. 181, 185 (1997). While there was testimony from Reis that the defendant and Fagbemi "exchanged words" before the defendant handed the gun over to Fagbemi, there was no evidence concerning what was said.

Nor was there an "appreciable interval" between the alleged withdrawal and the crime. See *Commonwealth* v. *Cook, supra.* See also *Commonwealth* v. *Serrano*, 74 Mass. App. Ct. 1, 4 (2009); *Commonwealth* v. *Branch, supra.* The victim was shot within seconds of the defendant's arrival at the end of Reis's driveway and the exchange of the gun. For these reasons, there was an insufficient basis in the evidence to support a withdrawal instruction, and there was no error in its omission or in defense counsel's failure to request it.

*Judgments affirmed.*