## COMMONWEALTH *VS.* GARY JOHNSON.

Suffolk. April 6, 2012. - August 2, 2012.

Present: IRELAND, C.J., SPINA, CORDY, GANTS, & DUFFLY, JJ.

*Homicide. Constitutional Law,* Voluntariness of statement, Admissions and
confessions, Burden of proof. *Due Process of Law,* Burden of proof.
*Evidence,* Voluntariness of statement, Admissions and confessions, Scientific
test, Expert opinion, Relevancy and materiality, Identification. *Practice,
Criminal,* Capital case, Voluntariness of statement, Admissions and confes-
sions, Motion to suppress, Argument by prosecutor, Presumptions and
burden of proof. *Felony-Murder Rule. Robbery. Firearms.*

A Superior Court judge properly denied the criminal defendant's pretrial mo-
tion to suppress statements he made to police officers during an interview,
where in the totality of the circumstances, the defendant's statements were
the product of a rational intellect and free will, and were not induced by
physical or psychological coercion. [102-106]
At the trial of indictments charging the defendant with, inter alia, felony-
murder and firearms violations, no error arose in the Commonwealth's
general use of gunshot residue evidence; further, the Commonwealth did
not proffer false evidence through the admission of testimony from a
chemist at the State police crime laboratory regarding the presence of
gunshot residue on a sweatshirt. [106-109]
At a criminal trial, the admission in evidence of testimony regarding a witness's
training in observation, even if construed as an abuse of discretion, did not
create a substantial likelihood of a miscarriage of justice, and the prose-
cutor's reference to that training in closing argument was not an impermis-
sible appeal to the jury's emotions, sympathies, biases, or prejudice.
[109-111]
At a murder trial, certain of the prosecutor's remarks in closing argument
constituted permissible commentary on the strength of the Commonwealth's
case and did not cross over into burden shifting, and one statement that
suggested that the defendant had an affirmative duty to counter the Com-
monwealth's evidence against him did not fall into the realm of prejudicial
error requiring reversal of the defendant's convictions, where the judge's
instructions effectively neutralized any prejudice produced by that state-
ment and surely mitigated any suggestion of burden shifting that may have
arisen elsewhere in the closing argument [111-114]; further, no error arose
from the prosecutor's characterization of evidence about the defendant's
heart rate at the time of his apprehension [114-115].
This court declined to exercise its power under G. L. c. 278, § 33E, to reduce
a conviction of felony-murder in the first degree or to order a new trial,
where eyewitness identification testimony was admitted properly and its
weight was a matter for the jury to consider. [115]

INDICTMENTS found and returned in the Superior Court Department on January 23, 2008.

A pretrial motion to suppress evidence was heard by *Timothy Q. Feeley*, J., and the cases were tried before *Frank M. Gaziano*, J.

*Greg T. Schubert* for the defendant.

*Zachary Hillman*, Assistant District Attorney (*Gretchen Lundgren*, Assistant District Attorney, with him) for the Commonwealth.

CORDY, J. On the morning of November 1, 2007, Mumin Manavoglu was shot in the face while pursuing the young man who had robbed him at gunpoint in the restaurant he owned in the Dorchester section of Boston. He died two days later. On May 22, 2009, a jury convicted the defendant — a young man whom the police apprehended in the area within minutes of the incident, whom two witnesses identified as the assailant, and who confessed to the crime during a police interview — of felony-murder in the first degree in violation of G. L. c. 265, § 1; armed robbery in violation of G. L. c. 265, § 17; possession of a firearm without a firearm identification (FID) card in violation of G. L. c. 269, § 10 (*a*); and possession of ammunition without an FID card in violation of G. L. c. 269, § 10 (*h*).

On appeal, the defendant contends that he is entitled to a new trial because (1) the judge erroneously denied his motion to suppress statements he made to the police during an interview conducted within hours of the robbery and shooting; (2) the Commonwealth presented false evidence regarding gunshot residue testing, which the defendant assails as " 'junk' science," that was conducted on an article of clothing found near the crime scene; (3) the prosecutor improperly elicited testimony from a police witness, who had identified the defendant, about the witness's military training on "observations," and inappropriately incorporated this testimony into his closing argument; and (4) the prosecutor made other comments during his closing argument that impermissibly shifted the burden of proof to the defendant and inaccurately characterized evidence against him. The defendant also urges us to exercise our authority to grant him a new trial under G. L. c. 278, § 33E, because, as he

views it, the Commonwealth's case relied heavily on eyewitness testimony that the defendant contends is a "notoriously unreliable" class of evidence, and which included testimony from two eyewitnesses who failed to identify the defendant as the assailant and one who affirmatively stated he was not the assailant.

After a thorough review of the record, we reject the defendant's claims and decline to grant him relief under G. L. c. 278, § 33E. Accordingly, we affirm the defendant's convictions of felony-murder in the first degree and the possession of a firearm and ammunition without an FID card. Because the armed robbery was the predicate felony for the defendant's felony-murder conviction, it is duplicative; consequently, we vacate the armed robbery conviction and remand to the Superior Court for dismissal of the indictment.[1] See, e.g., *Commonwealth* v. *Lopes*, 455 Mass. 147, 148 (2009).

*Background.* We recite the facts as the jury could have found them, reserving certain details for later discussion.

1. *The robbery and shooting.* Manavoglu and Murat Yildirim owned a small restaurant located at 140 Norfolk Street. On the morning of November 1, 2007, they were in the food preparation area, which was located behind a counter. At approximately 9:30 A.M., Yildirim ended a telephone call with a customer and noticed a man standing on the other side of the counter, pointing a gun at him. The man, who was covering his face and wearing a black or gray hooded sweatshirt with the hood on his head, demanded money. He then walked behind the counter, past Manavoglu, and stood beside Yildirim. The man ordered Yildirim to open the cash register, remove its contents, and put the money in a white plastic bag.[2]

After taking the bag containing the money from Yildirim, the man left the restaurant. As he did so, he greeted a female customer, Amelia Smith, who had entered the restaurant during the robbery.

---

[1] The trial judge foresaw this outcome at sentencing, at which time he ordered the armed robbery conviction dismissed, "subject [to] the affirmance of the subject murder conviction."

[2] The bag with the money was never recovered. There was testimony at trial suggesting that a third person may have picked up the money discarded by the defendant and left the scene.

Manavoglu followed the man, quickly catching up with him on Norfolk Street. A struggle ensued, and Manavoglu fell to the ground. The man fired the gun. After Manavoglu lifted himself from the ground and continued toward the man, the man fired a second shot. This one struck Manavoglu in the face, causing him to fall once again. Although the shot did not kill the victim instantly, the bullet perforated his skull, ricocheted off the back of his head, and lodged in his brain.[3]

After the shooting, the man ran down Norfolk Street. He encountered a marked police cruiser that Boston police Officer Tamara Finley was driving up Edson Street, which intersects with Norfolk Street. Officer Andrew Heggie, Finley's partner and passenger in the cruiser, watched as the man, who was dressed in a black hooded sweatshirt, black hat, and black pants, ran down Edson Street, only to stop and turn in the other direction after seeing the cruiser. The man then continued running, crossed Norfolk Street, and ran toward an open field situated between Norfolk Street and Woodrow Avenue.

When Heggie and Finley reached Norfolk Street, they saw the victim lying on the ground and a group of people gesturing in the direction the officers presumed the man had run. The officers turned on the cruiser lights and siren and proceeded to that area, where they conducted a brief search. They returned to the restaurant without locating the man.

By this time, other officers had responded to the scene. While Finley tended to the victim, Heggie walked across Norfolk Street to continue the search. Behind a church located at 151 Norfolk Street, he discovered two items that matched the clothing he had seen the man wearing: a black hooded sweatshirt on the ground near a trash barrel and a black hat in the barrel. On the other side of a fence separating the church property from that of an automobile repair shop, Heggie also observed a firearm, magazine, and live rounds of ammunition lying on the ground. Ballistics testing revealed that this firearm had fired the bullet that struck the victim.[4]

Officer Michael Sullivan, who had responded to the scene,

---

[3]The victim succumbed to the injuries he sustained from the shooting on November 3, 2007.

[4]After further canvassing the area, officers found a black glove close to

initiated his own search for the assailant. He jumped over a fence into the back yard of 8 Woodrow Avenue, a street that intersects with Norfolk Street across from the restaurant, and observed a pair of dark pants on the ground near a shed. He drew his firearm and approached the back of the shed, where he found a man, later identified as the defendant, "hunched over in a ball" with his "shirt over [his] head and [his] hands underneath [his] shirt." Sullivan's partner arrived in the yard, and the officers arrested the defendant. As they placed him in handcuffs, Sullivan rested his hand on the defendant's chest and felt that his heart rate "appeared fast."

The officers then escorted the defendant to the crime scene, where they conducted identification procedures with various witnesses to the robbery and shooting. Heggie identified the defendant as the man he had seen from the police cruiser fleeing the scene. Barbara Delaney, a woman who had witnessed the struggle and shooting from her automobile, positively identified the defendant as the culprit; Yildirim and Mohamed Horyani, an employee of the restaurant who witnessed the shooting from the sidewalk in front of it, were unable to do so; and Smith, the woman who had entered the restaurant during the robbery, told the police they had "the wrong guy." Alexandria Veiga, a young woman who lived in the neighborhood and had known the defendant for "[a]lmost two years," also testified that she saw the defendant standing in front of a store adjacent to the restaurant at approximately 9:20 or 9:25 A.M., just a few minutes before the robbery.

Once the identification procedures were complete, officers transported the defendant to a nearby police station for an interview. The interview, which was audiotaped, lasted just over one hour and culminated in the defendant admitting that he had committed the robbery and shooting.

2. *The defendant's statements.* The interview was the primary focus of the motion to suppress and was played, in its entirety,

where Officer Heggie had discovered the sweatshirt and hat, and a spent shell casing near the corner of Norfolk and Edson Streets. Later assessments revealed that the glove tested positive for gunshot residue and that the spent shell casing, like the bullet that struck the victim, matched the firearm Heggie had found on the ground.

at trial. To avoid repetition, we recite facts that were presented by the Commonwealth at an evidentiary hearing on the motion to suppress and at trial. We supplement these facts with findings of the motion judge, who was not the trial judge, and information gathered from our own review of the audiotaped recording.

After his apprehension and the subsequent identification procedures, the defendant — who was eighteen years old and in the eleventh grade — was placed in the back of a marked police cruiser. He was joined there by Sergeant Detective Joseph Mac-Donald, who administered the Miranda warnings after some brief preliminaries. MacDonald told the defendant, "[I]f you did something stupid or an accident happened . . . this would be the time to tell us," and asked the defendant why he had been at the shed. The defendant did not respond to the first statement, but told the detective that he had stayed in the yard all night because he had gotten into an argument with his parents. MacDonald ended the discussion there and transported the defendant to the police station.

At the station, the defendant was brought directly to an interview room, where he was met by Detectives Brian Black and Kevin Magoon.[5] After introductions, Black turned on a digital audio recorder, which he did not turn off until the interview was concluded, and obtained the defendant's consent to record the interview. Like MacDonald, Black then administered the Miranda warnings. He read each warning as it appeared in a form presented to the defendant, confirmed that the defendant understood each right, and had the defendant signify this understanding by writing his initials on the form after each individual right was discussed. The defendant also signed his name on a line at the bottom of the form, which confirmed that he was "willing to make a statement at this time without a lawyer being present."

Once the Miranda warnings were complete, the questioning began. Black first asked the defendant to explain "in [his] own words" how he had come in contact with the police that morning. The defendant told Black that he and his mother "had a little misunderstanding" that prompted him to leave his house; that he "was staying at [his] friend's house last night and then

---

[5]Although Detective Magoon was present during the interview, he did not participate in the questioning.

something happened there and then [his friend] left"; and that, as a result, the defendant had spent the night in the back yard, which he described as a "hangout" for him and his friends. He claimed to have fallen asleep there, and only awoke from his slumber when the police officers entered the yard, pointing their firearms at him and ordering him up off the ground.

Black proceeded to probe details of this account. He also inquired about the defendant's activities the previous day, and was told that the defendant had spent the day in school and visited his friend that evening. Over the course of the interview, the defendant also informed Black that he had returned to his house after the school day ended; purchased a drink and snack from the store next to the restaurant on Norfolk Street; attended a family Halloween party in the neighborhood; and briefly "chill[ed]" with other friends before arriving at 8 Woodrow Avenue. Once there, he told Black, he smoked a marijuana cigarette.[6]

While engaging in this dialogue, Black occasionally expressed disbelief in the defendant's account. The defendant, however, maintained for the bulk of the interview that he was asleep when the police found him in the back yard and that he had not heard any sirens, police radios, or gunshots. When Black inquired whether further investigation of the scene would yield any physical evidence connecting the defendant to it, the defendant denied the possibility, although he did allow that his fingerprints could appear in the store and restaurant, both of which he frequented.

Approximately fifty minutes into the interview, Black brought up the potential charges the defendant faced. He informed the defendant that, at that moment, the conduct alleged constituted armed robbery and armed assault with intent to murder. But, Black continued, if the victim died, the defendant would be charged with murder, which carried a sentence of life in prison. On learning this information, the defendant put his hands to his face and placed his head on the desk at which he was sitting.

After this exchange, the defendant continued to respond to Black's questions, which focused on the defendant's claim that he had not heard any noise that morning. Black then equated

---

[6]The defendant assured the detective that he had not ingested any marijuana the morning of the interview.

the interview to a report card, telling the defendant that "[p]eople are going to listen to this interview down the road and they're going to judge whether they believe you or not, okay." When he continued, "They're going to give you either an A," the defendant added, "or F."

Moments later, the defendant stated, "You know what, sir? You're good. I'm going to give you a handshake. You know what? . . . I did do it." He then sketched a brief outline of the morning's events. The defendant stated that he had been sitting in his house, thinking about how he needed money. He had an automatic weapon that was "big," "black," with a "wooden handle," and did not know whether it was loaded. He wore a black hooded sweatshirt, black pants, and one glove on his left hand. He entered the restaurant, demanded money, took money from a man who had retrieved it from the cash register, and then fled. As he did so, another man from the back of the restaurant ran up to the defendant and grabbed him from the back. The defendant turned, pulled the trigger of the gun, and ran away without looking back. He said that he did not see a police cruiser while running, but that he did "throw . . . off" his clothes to "chang[e his] identity." The defendant then ran to the yard and lay down, which is where the police found him.

The interview concluded shortly thereafter, and the defendant was brought to another area of the police station for booking, where he was offered the use of a telephone. The defendant telephoned his father at approximately 12:45 P.M.

*Discussion.* 1. *Motion to suppress.* Before trial, the defendant moved to suppress the statements he had made during the police interview, alleging that they were obtained in violation of *Miranda* v. *Arizona*, 384 U.S. 436, 467-474 (1966), and that they were not voluntary. The judge denied the motion in a written memorandum of decision and order, concluding that, "[in] the totality of circumstances, . . . [the defendant] voluntarily waived his *Miranda* [rights], and . . . his post-arrest statements were voluntary."

On appeal, the defendant argues that this order was in error because his statements were not made voluntarily.[7] To that end,

---

[7]The defendant does not renew his argument concerning *Miranda* v. *Arizona*, 384 U.S. 436, 467-474 (1966), and we find no reason to revisit it.

he alleges that, at the time of the interview, he was young, inexperienced, terrified, and likely intoxicated, and that, during the interview, Detective Black lied about forensic evidence implicating him and falsely suggested that confessing would be advantageous.

In reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). Given the focus of the defendant's appeal, the relevant constitutional inquiry is whether, in the totality of the circumstances, the defendant's statements were "the product of a 'rational intellect' and a 'free will,' and not induced by physical or psychological coercion."[8] *Commonwealth* v. *Tolan*, 453 Mass. 634, 642 (2009), quoting *Commonwealth* v. *LeBlanc*, 433 Mass. 549, 554 (2001). In light of the deference owed the judge's findings, and on our own review of the recorded interview, we affirm the order denying the defendant's motion to suppress.

As the judge noted, and we so conclude, the interview lasted "only about an hour" and was attended by two plain clothes detectives (one of whom did not participate in the questioning). The tone was not hostile, and the environment not oppressive: the defendant's handcuffs were removed, he was seated during the interview, and he was not deprived of food, drink, or rest. While the defendant was only eighteen years of age and a junior in high school at the time, the record does not suggest that he had any mental impairments or disabilities, and the recording makes clear that he understood all questions and responded to them appropriately.

With regard to the defendant's other arguments concerning his ability to make the statements voluntarily, there is simply no

---

[8]"Relevant factors include, but are not limited to, 'promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings.' " *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995), quoting *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986).

basis from which to conclude that he was intoxicated or "terrified" at the time of the interview. First, he plainly told the detectives that he did not drink alcohol and that he had not smoked marijuana that morning. Although the defendant initially responded, "Maybe not," when Detective Black asked whether the marijuana he smoked the previous night was "having any interference with [his] ability to make decisions today," the defendant responded, "Not at all," when Black further inquired whether the defendant felt "high." Thus, we do not credit the defendant's assertion on appeal that he was "most likely" intoxicated: his statements hew toward the contrary conclusion, and nothing about his tone or demeanor would suggest otherwise. Contrast *Commonwealth* v. *Meehan*, 377 Mass. 552, 561, 565-568 & n.9 (1979), cert. dismissed, 445 U.S. 39 (1980) (statement not voluntary where, among other things, defendant ingested twenty Valium pills and twelve containers of beer night before interrogation and consumed additional Valium pills hours before interrogation began).

Similarly, there is scant justification for the defendant's current contention that he was "terrified," such that his statements were not made voluntarily. To be sure, Black noted that the defendant briefly put his head in his hands and, at times, seemed "nervous" and "scared." On the other hand, the defendant also appeared lucid, coherent, and articulate throughout the questioning, and Black told him, in a nonaggressive manner, "I'm not trying to scare you and I hope you understand that. I'm trying to explain to you how serious this is." The defendant's emotional state is wholly consistent with the situation in which he found himself and the gravity of the charges he faced; it did not render him so emotionally unstable or irrational that he could not act voluntarily, nor was it the product of any alleged police coercion.[9] Compare *Commonwealth* v. *LeBlanc*, *supra* at 555 (statements voluntary where, "[a]lthough the defendant was emotionally upset, he spoke calmly when giving his statement, and there

---

[9]We also do not find persuasive the defendant's contention that he may have urinated in his shorts during the interview. While evidence that the defendant's shorts smelled of urine was adduced at trial, there was no indication of the time at which they were soiled, and Detective Black testified at trial that he did not notice any odors emanating from the defendant during the interview.

[was] no evidence that he was acting irrationally"), with *Commonwealth* v. *Magee*, 423 Mass. 381, 387-388 (1996) (statements involuntary where defendant, in exhausted state, cried and shook uncontrollably). See *Commonwealth* v. *Tolan, supra* at 644 ("defendant's conduct was consistent with stress caused by the death of her husband and subsequent investigation, and not in any way by improper police actions").

Finally, we are not persuaded by the defendant's arguments that Detective Black acted improperly during the interview. Black accurately informed the defendant of the charges he faced and the evidence against him. While Black also questioned the defendant about additional evidence the police investigation might produce, he never implied the police had evidence that they did not, nor did he exaggerate the strength of the evidence they did possess.[10] Contrast *Commonwealth* v. *Baye*, 462 Mass. 246, 257 (2012) (statement involuntary where "troopers exaggerated the strength of the evidence against the defendant").

Relatedly, Black also never improperly implied that confessing would benefit the defendant. Specifically, Black told the defendant: "This is kind of a bad situation"; "If for some reason you went in [the restaurant] to do a robbery and somehow the gun went off, I don't know how, today is the day to tell me that"; and "I want to give you the opportunity today to get out in front of this." These statements fall within the general rule that "[a]n officer may suggest broadly that it would be 'better' for a suspect to tell the truth, . . . or may state in general terms that cooperation has been considered favorably by the courts in the past." *Commonwealth* v. *Meehan, supra* at 564. See *Commonwealth* v. *Tolan, supra* at 643 (approving of statements made during interrogation, including, "We'll help you because that's why we're here, to find the truth," and "Now it's time to help yourself out"); *Commonwealth* v. *Souza*, 428 Mass. 478, 481-484 (1998) (statement that it was in defendant's "best interest" to "set the record straight" was proper and gave no assurance). They did not relay to the defendant "an assurance,

---

[10]For example, Black asked the defendant if there was "any reason [scientists] might find your fingerprints over on any building along Norfolk Street." Detective Black also said, "I'm not suggesting that I have your fingerprints on anything."

express or implied, that [his cooperation would] aid the defense or result in a lesser sentence." *Commonwealth* v. *Meehan, supra.*

In sum, the judge aptly concluded that, in the totality of the circumstances, the defendant's statements were voluntary.[11] The denial of the defendant's motion to suppress was proper.[12]

2. *Testimony concerning gunshot residue testing and results.* The defendant next challenges the admission of certain testimony from John E. Drugan, a senior chemist at the State police crime laboratory.

During the Commonwealth's case-in-chief, Drugan testified about gunshot residue testing and the presence of gunshot residue on the sweatshirt and glove recovered in the vicinity of 151 Norfolk Street. Drugan informed the jury that gunshot residue is comprised of "particles," each of which contains three basic compounds uniquely fused together during the firing process. He further explained that, under the guidelines promulgated by the Federal Bureau of Investigation and adopted by the State laboratory, at least three of these particles — each with the requisite three compounds — must be present on an object for it to yield a positive result during testing. After laying this foundation, Drugan testified that the sweatshirt yielded a nega-tive result because no particles were found on the left cuff and only two were found on the right. In contrast, he concluded that

---

[11]The defendant folds into his voluntariness argument the fact that he was not offered a telephone call until after the interview concluded, which would be approximately two hours after he arrived at the police station. The timing of this offer, then, exceeds the dictates of G. L. c. 276, § 33A, which provides that a person under arrest at a police station is entitled to be informed "forthwith upon his arrival . . . of his right to so use the telephone . . . and such use shall be permitted within one hour thereafter."

We have concluded previously that "the failure affirmatively to comply with [G. L. c. 276, § 33A,] is a factor in deciding whether a confession, vulnerable on other grounds, should be suppressed." *Commonwealth* v. *Mee-han*, 377 Mass. 552, 567 (1979), cert. dismissed, 445 U.S. 39 (1980). Because the statements at issue here are not vulnerable on other grounds, the timing of the offer has little bearing on our inquiry.

[12]We note here that the trial judge granted the defendant's request for a "humane practice" instruction. Thus, prior to playing the audio recording of the interview in court, the judge explained to the jury that, before they could consider the defendant's statements as evidence, the Commonwealth had to prove beyond a reasonable doubt "that the defendant made the statement he's alleged to have made [and] that he made it voluntarily, freely and rationally."

the glove tested positive for gunshot residue, because he identified five particles on it.[13] The defendant did not object to this part of Drugan's testimony.

The defendant now contends that gunshot residue analysis is " 'junk' science," and urges us to dismiss it as such. He also argues that Drugan's testimony with respect to the sweatshirt constituted a proffer of false evidence by the Commonwealth, which misled the jury into believing that gunshot residue was present on it despite the negative test result. In response, the Commonwealth notes that this court recently affirmed the relevance and admissibility of gunshot residue evidence, see *Commonwealth* v. *Pytou Heang*, 458 Mass. 827, 851 (2011), and argues that Drugan's testimony was probative insofar as it showed that particles unique to gunshot residue had been identified on a sweatshirt found near the defendant.

Although the defendant failed to raise the issue before the trial judge, we recognize that several forms of forensic identification evidence recently have come under increased scrutiny.[14] Yet, the defendant presents no compelling evidence that would undermine our conclusion in the *Pytou Heang* decision that gunshot residue testing can serve as probative evidence. *Id.* (noting that chemist's explanations how "unique particles" of gunshot residue could appear on defendant's clothing permitted jury to draw inferences of culpability). As in *Pytou Heang, supra*, the presence of gunshot residue particles on the glove was probative given Drugan's conclusion that the person wearing it either "fired a weapon, handled a weapon or was in close proximity to a fired weapon." We discern no error in the Commonwealth's general use of gunshot residue evidence at trial.

[13]Drugan also testified that another chemist tested samples taken from the defendant's hands on the day of the shooting. He provided his own opinion regarding this data, concluding that the results were negative because no particles were found.

[14]For a thorough, and at times scathing, analysis of forensic identification methods, see National Research Council, Strengthening Forensic Science in the United States: A Path Forward (2009). Gunshot residue testing was not examined in the report and, although the defendant cites to this report, we agree with the Commonwealth that the absence of gunshot residue testing from the study is better attributed to the report's focus on problematic forensic disciplines rather than on the nonrecognition of gunshot residue testing as forensic science.

See *id.* See also *Commonwealth* v. *Marrero*, 459 Mass. 235, 239 n.6 (2011) (no error in admission of expert testimony on gunshot residue evidence).

We also find no error in the admission of Drugan's testimony regarding the presence of gunshot residue on the sweatshirt. Drugan testified that, because only two particles were identified on the right cuff, the sweatshirt tested negative for gunshot residue. The distinction implicit here is critical, as the prosecutor then asked, "[I]f there are two found, why is your conclusion that *there was no gunshot residue particles detected*?" (emphasis added). Drugan answered, "[W]e need a minimum of three, three or more, to call it a positive result."

Thus, on a fair reading of the transcript, it is clear that the Commonwealth did not proffer false evidence through this testimony. Drugan did not present facts he knew to be untrue, nor did he offer any opinions unsupported by the evidence. Contrast *Miller* v. *Pate*, 386 U.S. 1, 6-7 (1967) (prosecutor repeatedly referred to defendant's clothing as "heavily stained with blood," despite knowing that stains were merely paint). Indeed, unlike his testimony regarding the glove, Drugan did not draw any conclusions connecting the person wearing the sweatshirt to the gun. Rather, his testimony provided the jury a precise and thorough analysis of the gunshot residue testing performed on the sweatshirt and left any inferences that might be drawn from it to them.

On this point, we note that the testimony regarding the sweatshirt was entirely relevant to the question of culpability. See Mass. G. Evid. § 401 (2012). On one hand, Drugan informed the jury that the sweatshirt tested negative for gunshot residue. Assuming the jury believed that the sweatshirt belonged to the defendant, this evidence was probative insofar as it tended to decrease the likelihood of the defendant's culpability. On the other hand, the jury were told that two particles were found on the sweatshirt, which in light of the unique nature of the chemical compounds present in gunshot residue particles, permitted an inference of an increased likelihood of the defendant's culpability. The jury were entitled to weigh the evidence and could have drawn reasonable inferences in either direction. See *Commonwealth* v. *Pytou Heang*, *supra* at 851 (applying principles

of *Commonwealth* v. *Benoit*, 382 Mass. 210, 221 [1981], to testimony regarding gunshot residue testing). The judge, therefore, did not abuse his discretion in admitting Drugan's testimony. See *Commonwealth* v. *Sylvia*, 456 Mass. 182, 191-192 (2010). There was no error.

3. *Testimony and argument concerning witness's military training on "observations."* The defendant's next assignment of error involves certain portions of the testimony elicited from Officer Heggie, and the prosecutor's reference to that testimony in his closing argument. Heggie affirmatively identified the defendant as the person fleeing the scene in the clothes described as worn in the robbery, and discovered the sweatshirt and hat around 151 Norfolk Street.

During his direct examination, Heggie testified that, before becoming a police officer in Massachusetts, he was in "a special operations unit [of the United States Army]" that "conduct[ed] operations such as airfield seizures and weapons in Afghanistan." The prosecutor asked him whether he "had any particular training with observations or anything that — any training with regard to observations and teaching you how to make observations?" Heggie answered affirmatively, and later explained, "We did a lot of training focusing in on making sure that we observed very exclusively on what we were looking at, minute type of details when we can, especially in high-risk situations." Heggie then agreed that the training "carr[ied] over to [his] police work," and stated, "It really helps out." From there, Heggie recounted the events he had observed on November 1, 2007, at which time he briefly viewed the defendant in motion while riding as a passenger in a police cruiser.

During closing argument, the prosecutor reminded the jury:

> "[Officer Heggie is] not just someone who's gone through the Boston Police Academy but someone who is a former, I believe he said, 'Army Ranger, been a part of insurgence teams.' This is a guy, respectfully, ladies and gentlemen, who has had some training in being observant, training in making observations, training that he's had, training that you get in the Army when your life depends on it, training that would obviously carry over into his every day work as a civilian police officer."

Because the defendant did not object to these portions of Heggie's testimony or the prosecutor's closing argument, we review to determine whether there was error and, if so, whether the error created a substantial likelihood of a miscarriage of justice.

On appeal, the defendant claims that the fact of Heggie's testimony and its incorporation into the prosecutor's closing argument improperly bolstered Heggie's credibility in the eyes of the jury and impermissibly appealed to their emotions, sympathies, biases, and prejudices. This error, he asserts, was particularly damaging where the identification evidence, of which Heggie's testimony was an important part, constituted the bulk of the evidence against the defendant. The Commonwealth, in turn, alleges that Heggie's testimony was relevant and admissible because it aided the jury in assessing the accuracy of his identification, which was made quickly. With regard to the closing, the Commonwealth further contends that the prosecutor properly recounted Heggie's testimony to highlight the accuracy of his identification and that, in any event, the aggregation of instructions provided to the jury would cure any risk that justice miscarried.

We agree that this type of bolstering is potentially misleading. Heggie did not testify that he received specialized training in eyewitness identification, only that he received some unspecified training in recognizing and focusing on details in the course of undergoing airfield and weapons seizures in Afghanistan. Contrast *United States* v. *Gockley*, 52 F.3d 338 (10th Cir.), cert. denied, 516 U.S. 877 (1995) (decision without published opinion) (dismissing defendant's argument that eyewitness identifications tainted and unreliable where witnesses had undergone "training [from the Federal Bureau of Investigation] in observation and identification skills"). Moreover, there was no evidence presented that such training (whatever it might have consisted of) actually improves the accuracy of eyewitness identifications. Nor was Heggie qualified as an expert witness on the subject. See *Commonwealth* v. *Bly*, 448 Mass. 473, 495 (2007), citing *Commonwealth* v. *Hyatt*, 419 Mass. 815, 818 (1995) ("Expert testimony is admissible on the issue of eyewitness identification, within the discretion of the trial judge").

Prosecutors who intend to offer evidence of specialized training to bolster the credibility of witnesses whose ability to make an accurate identification has been (or will be) challenged at trial, should give advance warning to the defendant and the trial judge. Its admissibility must be considered with some care. A voir dire of the witness may be undertaken to ascertain the probative value of the testimony and to determine whether that value is outweighed by its likely prejudice.

Because there was no objection here, the record is abbreviated and our review is constrained. We disagree, however, that Heggie's testimony on the subject, and the prosecutor's reference to it in his closing argument, was an impermissible appeal to the jury's emotions, sympathies, biases, or prejudice. See *Commonwealth* v. *Montez*, 450 Mass. 736, 749 (2008), quoting *Commonwealth* v. *Perry*, 254 Mass. 520, 531 (1926). Nor are we inclined to agree, on a review of the trial record as a whole, that the admission of the testimony, even if construed as an abuse of discretion, created a substantial likelihood of a miscarriage of justice.

4. *Prosecutor's closing argument.* Finally, the defendant argues that the prosecutor's closing argument was deficient in two additional respects, thus depriving him of his due process right to a fair trial. Specifically, he contends that the prosecutor improperly shifted the burden of proof by repeatedly arguing that the facts were "stubborn," and inaccurately characterized evidence about his heart rate at the time of his apprehension. We are not persuaded by the defendant's analysis of these remarks, which we review "in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.' " *Commonwealth* v. *Rodriguez*, 437 Mass. 554, 565 (2002), quoting *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984).

a. *Burden shifting claims.* The defendant's first assignment of error involves the manner in which the prosecutor characterized the Commonwealth's case. Early in his argument, the prosecutor said that the "facts are hard for [the defendant]. How is [defense counsel] going to deal with that? Those facts are stubborn. You can't get around that." The defendant objected to these remarks, and the judge sustained the objection without

comment. The prosecutor then said, "Ladies and gentlemen, I suggest to you that the facts in this case are stubborn facts. They are stubborn facts in that they are hard facts to get around. No matter how hard or how passionate a person may argue, the facts are what they are, stubborn facts." He referred to the facts as "stubborn" at least twice more during his argument. Although defense counsel did not renew his objection during the prosecutor's closing, he did offer an objection after the jury instructions were complete, claiming that the prosecutor had continued to refer to "stubborn facts" and effectively had shifted the burden of proof to the defendant. The judge noted the objection, but declined to take corrective action. We review for prejudicial error.[15]

As a general rule, a "prosecutor . . . cannot make statements that shift the burden of proof from the Commonwealth to the defendant." *Commonwealth* v. *Amirault*, 404 Mass. 221, 240 (1989), citing *Commonwealth* v. *Sherick*, 23 Mass. App. Ct. 338, 343-346, *S.C.*, 401 Mass. 302 (1987). Such burden shifting typically arises where a prosecutor offers direct comment on the defendant's decision not to testify, see *Commonwealth* v. *Feroli*, 407 Mass. 405, 409 (1990), quoting *Commonwealth* v. *Storey*, 378 Mass. 312, 324 (1979), cert. denied, 446 U.S. 955 (1980), or "calls the jury's attention to the defendant's failure to call a witness or witnesses, or . . . 'to contradict testimony.' " *Commonwealth* v. *Tu Trinh*, 458 Mass. 776, 787 (2011), quoting *Commonwealth* v. *Miranda*, 458 Mass. 100, 117 (2010). In these cases, "the prosecution is signaling to the jury that the defendant has an affirmative duty to bring forth evidence of his innocence, thereby lessening the Commonwealth's burden to prove every element of a crime." *Commonwealth* v. *Tu Trinh*,

---

[15]The Commonwealth claims that the defendant did not object to the subsequent references to "stubborn facts," and thus urges this court to review those portions of the defendant's claim only for a substantial likelihood of a miscarriage of justice. Defense counsel, however, clearly objected to the perceived tenor of the prosecutor's closing argument at the first opportunity, the judge having instructed the jury immediately after closing arguments were complete, and only inquiring of counsel when he was finished. In this scenario, we deem it appropriate to consider the objection preserved. See *Commonwealth* v. *Kater*, 432 Mass. 404, 422-423 (2000), discussing *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 & n.8 (1987) (objection at conclusion of prosecutor's closing argument normally preserves defendant's rights).

*supra.* See *Commonwealth* v. *Sherick, supra* at 342-346, and cases cited. Within this limit, however, a "prosecutor is entitled to emphasize the strong points of the Commonwealth's case and the weaknesses of the defendant's case." *Commonwealth* v. *Feroli, supra.*

Our review of the record persuades us that, on balance, the prosecutor's remarks constituted permissible commentary on the strength of the Commonwealth's case, which did not cross over into burden shifting. By employing the word "stubborn," the prosecutor aptly described the weight of the evidence the jury had heard and subtly rebuffed defense counsel's attempt, in his closing, to marshal that evidence in his favor.[16] In this respect, the prosecutor did not focus the jury's attention on a specific element missing from the defense, nor did the prosecutor otherwise suggest to the jury — either implicitly or explicitly — that the defendant had an affirmative duty to counter the Commonwealth's evidence against him.

The same cannot be said, however, of the first statement the prosecutor made to the jury, in which he pondered, "How is [defense counsel] going to deal with that?" In contrast to his later statements, the prosecutor, with this rhetorical question, intimated that defense counsel *had* to "deal with" the "stubborn facts" in some way, which could have suggested to the jury a positive responsibility on the part of the defendant. See *Commonwealth* v. *Habarek,* 402 Mass. 105, 111 (1988), citing *United States* v. *Skandier,* 758 F.2d 43, 45 (1st Cir. 1985) ("As a general rule . . . rhetorical questions should not be used in closing argument where they could be perceived by the jury as shifting the Commonwealth's burden of proof to the defendant").

Despite the defendant's arguments to the contrary, we do not find that this transgression falls into the realm of prejudicial error, such that reversal of his convictions would be warranted. The trial judge sustained the defendant's first objection, which was seasonably made against the rhetorical question described

---

[16]The prosecutor also invoked the same rhetoric employed in 1770 by John Adams during his closing argument in the case in which Adams defended British soldiers involved in the Boston Massacre (*Rex* v. *Wemms*). 3 Legal Papers of John Adams 269 (L. Wroth & H. Zobel eds. 1965).

above, and the prosecutor did not pose such a query to the jury again. Further, the judge twice informed the jury — once before and once after the closings — that closing arguments did not constitute evidence, and he emphasized on multiple occasions that the Commonwealth carried the burden of proving the entire case. The judge also instructed the jury that the defendant was presumed innocent, that "the defendant never has a burden to prove his innocence or to produce evidence," and, in explaining that the defendant "has an absolute right not to testify," that "[i]t is not up to the defendant to prove that he is innocent." These instructions, to which we presume the jury adhered, see *Commonwealth* v. *Amirault*, *supra*, effectively neutralized any prejudice produced by the prosecutor's rhetorical question, and surely mitigated any suggestion of burden shifting that may have arisen elsewhere in the closing argument. See *Commonwealth* v. *Tu Trinh*, *supra* at 788; *Commonwealth* v. *Miranda*, *supra*; *Commonwealth* v. *Montez*, 450 Mass. 736, 747-748 (2008). Thus, we are satisfied that these portions of the prosecutor's closing argument did not "substantially sway[]" the jury. *Commonwealth* v. *Semedo*, 456 Mass. 1, 14 (2010), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

b. *Factual allegation.* We briefly address the defendant's contention that the prosecutor offered "an additional, significant, inaccurate argument" when he told the jury that the defendant's "heart [was] pounding" at the time of his arrest. As the record makes clear, this statement was founded in evidence: Officer Sullivan testified that, when he put his hand on the defendant's chest after placing handcuffs on him, the defendant's heart rate "appeared fast." See *Commonwealth* v. *Guy*, 441 Mass. 96, 110-111 (2004), citing *Commonwealth* v. *Stote*, 433 Mass. 19, 28 (2000) ("Prosecutors must limit the scope of their closing arguments to facts in evidence and the fair inferences that may be drawn therefrom"). Insofar as the defendant is contesting the line the prosecutor drew from this fact to the defendant's alleged escape from the scene of the crime, his argument also fails. The prosecutor's remark was a fair and reasonable inference drawn from the evidence at trial, which suggested that the defendant had run quickly from the restaurant only a short time before Sullivan apprehended him in the back yard, and it was

properly included in the closing. See *Commonwealth* v. *Buckman*, 461 Mass. 24, 37-38 (2011), cert. denied, 132 S. Ct. 2781 (2012), discussing *Commonwealth* v. *Robertson*, 408 Mass. 747, 755 (1990) (allowing prosecutor to draw "reasonable and possible" inference in closing). There was no error.

5. *G. L. c. 278, § 33E.* The defendant urges the court to employ its power to order a new trial under G. L. c. 278, § 33E, because of the unreliability of the eyewitness identification testimony. We decline to do so. The evidence was admitted properly and its weight was plainly a matter for the jury to consider, along with evidence linking the defendant to clothing worn during the commission of the robbery and shooting, his apprehension near the scene of the crime shortly after it occurred, and his confession to the police. See *Commonwealth* v. *Odware*, 429 Mass. 231, 236 (1999).

*Conclusion.* The judgment for armed robbery is vacated and the underlying indictment is remanded for dismissal. The defendant's remaining convictions are affirmed.

*So ordered.*