NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

17-P-408                                        Appeals Court

COMMONWEALTH  vs.  TIMOTHY LAVIN.

No. 17-P-408.

Worcester.     March 12, 2018. - October 30, 2018.

Present:  Vuono, Hanlon, & Wendlandt, JJ.


Robbery.  Home Invasion.  Assault and Battery.  Firearms.
    Evidence, Fingerprints, Disclosure of evidence, Expert
    opinion, Argument by prosecutor.  Practice, Criminal,
    Disclosure of evidence, Mistrial, Instructions to jury,
    Argument by prosecutor.  Witness, Expert.



    Indictments found and returned in the Superior Court
Department on February 17, 2011.

    The cases were tried before Janet Kenton-Walker, J.


    Justin Drechsler for the defendant.
    Donna-Marie Haran, Assistant District Attorney, for the
Commonwealth.


    HANLON, J.  After a jury trial, the defendant was convicted

of armed robbery while masked, in violation of G. L. c. 265,

§ 17; home invasion, G. L. c. 265, § 18C; assault and battery,

G. L. c. 265, § 13A (a); possession of ammunition without a

firearm identification card, G. L. c. 269, § 10 (h); and impersonating a police officer, G. L. c. 268, § 33.[1]  At the end of the trial, after the defendant was found guilty of possession of ammunition without a firearm identification card, he pleaded guilty to a sentence enhancing element of that charge, one that charged him with being a career criminal pursuant to G. L. c. 269, § 10G.

The defendant appeals, arguing that the judge erred (1) in denying his motion for a required finding of not guilty; (2) by allowing the Commonwealth's expert to testify about certain fingerprint evidence; and (3) in failing to grant a mistrial or to provide a curative instruction to the jury about comments made during the prosecutor's closing argument that the defendant alleges were burden-shifting.  The defendant also contends that he was unfairly prejudiced by the Commonwealth's late disclosure of footwear impression evidence.  We affirm.

Background.  The jury heard the following evidence.  On November 27, 2010, the victim was living in a second-floor apartment in a two-family house owned by his grandmother, who lived in the first-floor apartment.  At approximately 2 A.M., he was watching a movie when his dog began pacing, "barking and

---

[1] Charges of possession of a firearm without a firearm identification card as a career criminal, use of a firearm while committing a felony, and possession of a class D substance were dismissed at the request of the Commonwealth prior to trial.

moaning, [and] growling . . . [which] was unusual."  Shortly afterwards, three men broke down his front door and entered the apartment, yelling, "WPD, WPD, Officer O'Malley.  Where's the drugs, cocaine?"[2]

Each intruder was wielding what appeared to be a semiautomatic firearm; two of the men were dressed in dark clothes and wore black ski masks and black "hoodies."  The third man was not wearing a mask; he was approximately five feet, seven to nine inches tall, and had a "long skinny face."  The victim described him as a "darker skinned individual.  He wasn't Caucasian."[3]  The victim was unable to give any physical description of the other two men, apart from clothing, because they were masked and wore hoodies.  One of those two men, who stayed with the victim "pretty much the whole time," was the defendant[4]; the victim described him as the largest of the three.

---

[2] The victim understood "WPD" to mean the Worcester police department.  Shortly after the intruders entered, the victim realized they were not police officers.  He testified, "So when they weren't presenting any badges and they were just flashing guns at me, that's when I kind of noticed they just weren't police."

[3] Later, the victim clarified, "Not too dark-skinned, but he wasn't Caucasian."  He described himself as "[h]alf Puerto Rican, half Irish," and testified that the man was darker than he was.

[4] We refer to this man as the defendant, although there was no direct identification testimony.  The Commonwealth's case was circumstantial and the issue for the jury at the end of the trial was, in fact, whether this man was the defendant.

He was approximately six feet tall, with a "[b]road build"; he wore a black hoodie, dark jeans, a black mask, and "Jordan 4" sneakers that were predominantly black with red and gray features.[5]  The other masked intruder was approximately five feet, ten inches tall.

The victim was very afraid, and his dog was barking continuously and urinating "all over the kitchen floor."  The "individuals were shouting at [him], telling [him] to put the dog in the cage," and he did so.  After that, "the individuals zip-tied" the victim's hands behind his back.  The defendant then pointed a gun at the victim and ordered him into the living room, where the victim "eventually . . . sat down on [his] couch."  The victim noticed his new cellular telephone (cell phone) on the arm of the couch; although he was able to slide it behind his back unnoticed, he was unable to gain access to it.[6]

The defendant stayed in the living room with the victim while the other two men ransacked the apartment.  At some point while he was watching over the victim, the defendant asked the victim where the drugs and money were located in the apartment.

---

[5] The victim testified that he was a sneaker collector and, therefore, noticed the specific details of this intruder's sneakers.

[6] The victim's previous cell phone, a "Samsung Instinct," had been deactivated but was located on a stand in the apartment kitchen.

The victim responded that he had a little marijuana in a drawer in the kitchen pantry. The defendant then led the victim at gunpoint to the kitchen pantry, but when he saw the victim's marijuana (which weighed approximately one ounce), the defendant insisted that there had to be more. The victim responded that he had no other drugs, and the defendant forced him back into the living room and ordered him to lie face down on the floor. When the victim refused, the defendant threatened him with the firearm; the victim believed he was going to die and did eventually lie face down on the floor. At the same time, the defendant also was communicating occasionally with the two other men.

While he was lying on the floor, the victim tried to reach for his cell phone, now under the couch, but the defendant grabbed it away from him. The defendant then left the living room, but quickly came back and reached behind the television stand, grabbed a wire, and used the wire to tie the victim's legs. He left the victim two more times, each time asking the victim if there was anything else in the apartment. The last time the defendant returned to the victim he was carrying a shoebox containing "junk" (including perfume and jewelry) and approximately $1,600 in cash. The victim estimated that, at that point, the men had been in his apartment for approximately forty-five minutes.

Roughly ten minutes later, the victim no longer heard the intruders and he believed that they had left. He was able to get to his feet and find a knife, but he was unable to cut the ties. He then "rolled down the stairs" to his grandmother's apartment and woke her up; his grandmother also was unable to cut the ties, so the victim asked her to call his friend, who lived nearby, to come and help. The friend came and freed the victim from the ties, and left shortly thereafter. The victim's grandmother then called the victim's mother, who arrived a short time later and called the police.

The victim then went back upstairs to his apartment to check on the damage. Walking up the stairs, he noticed a fully loaded ammunition clip on the stairs. He picked up the clip with the sleeve of his sweater, and then placed it back down in the same place.[7] Although he spoke to the police when they responded to the call, the victim also went to the Worcester police station later that day and gave a more detailed account of the home invasion, including a description of the items that had been taken. He also described the Jordan sneakers the defendant had worn.[8]

---

[7] The victim had not seen the ammunition clip on the stairs when he returned to his apartment before the home invasion.

[8] The victim returned to the police station after that time and gave the police a list of items taken from his apartment during the home invasion.

During their investigation, police officers recovered the ammunition clip from the stairs to the victim's second-floor apartment.  Inside the apartment, they seized plastic zip ties and a "webcam-type device with a wire"; each of the items was logged as evidence of the crime.  Officers also canvassed the victim's neighborhood; one neighbor, who lived about four houses away from the victim, told the police that he had been smoking a cigarette on his front porch when he noticed a tan vehicle parked across the street from his house at about 3 A.M. According to the neighbor, it was a "strange" vehicle, that is, he did not recognize it as belonging to anyone on the street. The neighbor saw a person get out of the vehicle and put on a hood, and then meet two individuals who were walking out of the woods at the end of the street, which is a "dead-end."  The neighbor then saw the three men walk into the victim's house. Approximately one-half hour later the neighbor heard the vehicle drive away.[9]

Worcester police Lieutenant David Grady recovered two latent fingerprints, one from the base of the ammunition clip

---

[9] The neighbor testified that even though, according to the police report, he had identified the make, model, and color of the vehicle when he was interviewed by the police around the time of the incident, at trial, he could not recall specific details.  He remembered that he had spoken with the police, and agreed that he had told them at the time that it was a tan vehicle, but he was unable to be more explicit.

and one from a zip tie found in the victim's apartment. After processing the fingerprints, Grady matched a fingerprint recovered from the ammunition clip to the defendant's left thumbprint.

At about 9 A.M. on November 28, 2010, police officers went to the defendant's girl friend's house. Inside the house, the officers found the defendant lying awake in one of the bedrooms and arrested him. In the same bedroom, the police found two bags containing two replica revolvers and one replica semiautomatic handgun. In addition, when he was arrested, the defendant was wearing a pair of Jordan sneakers, which the victim later identified as the sneakers worn by the intruder who had kept watch over him.

Later that day, after the police sought and received a search warrant, they returned to the girl friend's house. Outside the house, an officer saw a "light-colored Chevy Blazer" parked in the driveway.[10] During the search, they seized additional evidence from the same bedroom where the defendant was found, including a black hooded sweatshirt and a pair of jeans from a hamper, winter knit hats from a pile of clothing on the floor, photographs of the defendant from a box in the

---

[10] The prior evening (on the day when the home invasion occurred), the same officer noticed that the defendant's girl friend had driven that same Chevy Blazer to the police station.

closet, and a black bag containing, among other things, black gloves, bandanas, a replica revolver, and a replica semiautomatic handgun.  In a second bedroom, officers found another black replica firearm and, in the kitchen, a garbage bag containing a Samsung cell phone with its battery and back cover removed.  The victim later identified the seized Samsung cell phone as his.

Discussion.  1.  Motion for required finding of not guilty. In reviewing the denial of a motion for a required finding of not guilty, we review the evidence in the light most favorable to the Commonwealth, along with reasonable inferences therefrom, to determine whether we are satisfied that the Commonwealth presented "enough evidence that could have satisfied a rational trier of fact of each . . . element beyond a reasonable doubt." Commonwealth v. Torres, 468 Mass. 286, 292 (2014), quoting Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).  The jury's inferences must be "reasonable and possible" (quotation omitted).  Commonwealth v. Woods, 466 Mass. 707, 713, cert. denied, 134 S. Ct. 2855 (2014).  In this case, the question is whether the Commonwealth presented sufficient evidence to identify the defendant as one of the three intruders.

Relying on Commonwealth v. Morris, 422 Mass. 254 (1996), the defendant argues that the thumbprint on the ammunition clip was the only evidence identifying him as one of the intruders

and that evidence was insufficient to prove beyond a reasonable doubt that he left the thumbprint on the clip during the commission of the crime. In Morris, the Supreme Judicial Court held that fingerprint evidence is admissible and that "[f]ingerprint evidence coupled with other evidence may rationally link a defendant to a crime." Id. at 257. However, there, the court concluded that fingerprint evidence on a mask worn by one of a group of intruders, even when considered with other evidence, was not sufficient to establish beyond a reasonable doubt that "the defendant had been at the crime scene and impressed his thumbprint on the mask at that time." Id. at 259. In that case, there also was evidence that "linked the defendant, or at least his residence," to two of the known intruders. Id. at 258. Nonetheless, the court concluded that the evidence was insufficient -- even when combined with evidence of the defendant's "possible resemblance to one of the intruders, the general resemblance of the motor vehicle owned by the defendant's mother to a vehicle leaving the crime scene, and the clarity of the thumbprint." Id. The court determined that this "add[ed] little weight to the evidence," and concluded that "[o]n the evidence a doubt that was reasonable as to the defendant's guilt had to remain." Id. at 260. See Commonwealth v. Anitus, 93 Mass. App. Ct. 104, 108 (2018) ("[T]he presence of a fingerprint on an object alone provides insufficient data to

determine when the fingerprint was placed on the object. Indeed, fingerprints can last for months after placement" [citations omitted]).

The facts in this case are easily distinguished because there was considerable evidence besides the thumbprint linking the defendant to the crime. First, the victim described the defendant, the largest of the three intruders (who had stood watch over him), as being approximately six feet tall with a "[b]road build" and wearing dark jeans, a black "hoodie," and black "Jordan 4" sneakers with red and gray features. In the bedroom where the police found the defendant, they also found a black hooded sweatshirt and a pair of jeans in a hamper. At the time of his arrest, the defendant was wearing Jordan sneakers. The victim later identified the sneakers as those worn by the largest intruder who had kept watch over him during the home invasion.

Second, the victim told the police that the three intruders were carrying semiautomatic weapons when they broke into his apartment. In the bedroom where they found the defendant, the police also found bags containing replica revolvers and a replica semiautomatic weapon, photographs of the defendant in the closet, and several more replica firearms.

Perhaps most important, "critically important," according to the judge when she denied the defendant's motion for a

required finding, the police found in a garbage bag in the kitchen a Samsung cell phone (broken in three pieces). When the victim went to the police station for an interview soon after the home invasion, he described for the police items taken from his apartment during the home invasion, including a Samsung cell phone. He also identified that Samsung cell phone recovered during the search as the cell phone missing from his apartment after the home invasion.[11] In addition, as the judge noted, given that the victim had not observed the ammunition clip earlier, it is very likely that it was left on the victim's stairway at the time of the home invasion and that the defendant's fingerprint was impressed on it at that time.

Finally, the victim's neighbor told the police that he saw a tan vehicle parked near the victim's home around the time of the incident; he saw someone get out of the vehicle, "put a hood on," and go into the victim's house with two other individuals who appeared to have "come out of the woods" near the end of the victim's dead-end street. At the time the police executed a search warrant at the house of the defendant's girlfriend, one of the officers noticed a "light-colored Chevy Blazer" parked in the driveway of that house.

---

[11] When one of the officers "powered up" the Samsung cell phone, the victim was able to predict accurately what would appear as well as "the first several contacts" recorded on the cell phone.

We are satisfied that, here, the fingerprint evidence coupled with all of the other evidence rationally linked the defendant to the crimes charged and was sufficient to persuade the jury beyond a reasonable doubt of the defendant's guilt. See Commonwealth v. Webster, 480 Mass. 161, 167 (2018) ("To be sure, the Commonwealth's case was circumstantial. Even so, 'circumstantial evidence is sufficient to establish guilt beyond a reasonable doubt.' Commonwealth v. Miranda, 458 Mass. 100, 113 [2010], cert. denied, 565 U.S. 1013 [2011], S.C., 474 Mass. 1008 [2016]"). See also Brangan v. Commonwealth, 478 Mass. 361, 364-365 (2017). As a result, the judge did not err in denying the defendant's motion for a required finding of not guilty.

2. Late disclosure of evidence. A few weeks before trial, the Commonwealth provided to the defendant photographs of "footwear impressions" left in the victim's apartment. On the first day of trial, the defendant moved to dismiss the indictments on the ground that the Commonwealth had failed to provide "exculpatory" evidence in a timely manner. After the disclosure, the defendant had located an expert who, defense counsel said, would testify that his analysis would exclude the defendant as the source of the imprints. The judge denied the motion, saying that the defendant had not shown that he had been prejudiced by the late disclosure.

At trial, in his opening statement, defense counsel told the jury, as he had informed the judge earlier, that his expert witness would testify that "[h]e specifically excludes Tim Lavin as the source of that print." However, in the middle of the trial, the expert recanted and told defense counsel that he no longer could provide that testimony.[12] The defendant then moved for a mistrial because, as he argued, he had made a promise to the jury that he no longer could keep. The judge denied the motion for a mistrial, but also ruled that the Commonwealth would be precluded from presenting any evidence of footwear impressions. In addition, the judge gave specific, curative instructions to the jury in her final charge, saying that she had excluded all of the evidence relating to the footwear impressions, that the jurors were to disregard anything they might have heard regarding footwear impressions, and that they were not to consider that evidence in any way.[13]

---

[12] Initially, the Commonwealth intended to offer evidence that footwear impressions obtained at the victim's apartment at the time of the crimes were "similar to" the soles of the sneakers that the defendant was wearing when he was arrested. After receiving the report of the defendant's expert, the Commonwealth's expert, using a new procedure, had developed evidence showing that, in fact, the prints were consistent with the defendant's shoes and were, for that reason, inculpatory. Defense counsel so informed his expert, who then responded that "he would not be helpful to the defense."

[13] After the testimony of Lieutenant Grady, whom the defendant cross-examined about any "imprints" left by the intruders' footwear, the judge gave a curative instruction that

"A defendant seeking relief as a result of delayed disclosure has the burden of showing that he was prejudiced by the delay." Commonwealth v. Brien, 67 Mass. App. Ct. 309, 310 (2006). "In measuring prejudice, 'it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence.'" Commonwealth v. Almeida, 452 Mass. 601, 609 (2008), quoting Commonwealth v. Stote, 433 Mass. 19, 23 (2000). "When confronted with the Commonwealth's failure to comply with its discovery obligations," a judge is afforded considerable discretion. Commonwealth v. Fossa, 40 Mass. App. Ct. 563, 567 (1996). Where "there has been disclosure but no evidence of bad faith, the question becomes whether the defendant had sufficient time to adjust to the disclosure in shaping and preparing his defense. . . . See Commonwealth v. Hamilton, 426 Mass. 67, 70 (1997) (denial of motion for two-week continuance not abuse of discretion where defendant failed to show prejudice by late disclosure of inculpatory fingerprint evidence)." Commonwealth v. Lao, 460 Mass. 12, 20 (2011).

We see no abuse of discretion. The defendant does not allege that the Commonwealth acted in bad faith. The evidence that was not disclosed until a few weeks before trial was, in the end, inculpatory, and the Commonwealth was precluded from

---

she was striking all testimony regarding footwear impressions and that the jury were to disregard any such testimony.

using it in any way.  We are satisfied that the judge's thoughtful solution, including her curative instructions to the jury, obviated any possible prejudice to the defendant from the late discovery or his counsel's unfulfilled promise.  See id. See also L.L. v. Commonwealth, 470 Mass. 169, 184 n.27 (2014). Contrast Commonwealth v. Chambers, 465 Mass. 520, 534-535 (2013) (Defendant prejudiced where judge reversed her pretrial ruling and precluded during trial evidence important to defense without providing sufficient curative jury instruction).

3.  Expert testimony.  Lieutenant Grady, testifying as an expert on latent fingerprint identification, opined that the fingerprint recovered from the ammunition clip found on the victim's stairs belonged to the defendant.  Describing the method used to extract the print and identify the defendant, Grady properly framed his findings in the form of an opinion, not overstating the match as a certainty; on cross-examination he clarified that he did not know when the defendant's thumbprint was "impressed upon the clip."  See Commonwealth v. Fulgiam, 477 Mass. 20, 44-45, cert. denied, 138 S. Ct. 330 (2017).

At the end of Grady's testimony, the prosecutor asked him whether his findings had been verified by another expert, and he responded, "Yes."  There was no objection.  That question should not have been asked.  See id. at 45-46, citing Commonwealth v.

Whitaker, 460 Mass. 409, 421-422 (2011) ("Expert testimony as to the opinions or conclusions of a second, nontestifying expert constitutes inadmissible hearsay").  However, any possible prejudice was cured when the verifying analyst did testify, thus allowing the defendant an opportunity to cross-examine her.[14] See Commonwealth v. Hurley, 455 Mass. 53, 63 (2009) (Although witness was unavailable, admitting her testimony from pretrial detention hearing did not violate confrontation clause because defendant had opportunity to cross-examine witness at earlier hearing).  Here, the defendant concedes that the opportunity for cross-examination cured any constitutional confrontation issue; however, he contends that "the hearsay and vouching issues remained."  He cites no authority for that argument, and in any event, it is clear that any error did not create a substantial risk of a miscarriage of justice.

4.  Closing argument.  Finally, the defendant argues that his motion for a mistrial was wrongly denied, because the prosecutor in her closing argument made remarks that were "burden-shifting."  The defendant objected to the remarks, and so we review to determine whether there was error and, if so, whether that error was prejudicial.  See Commonwealth v.

---

[14] The defendant did not cross-examine that expert.

Johnson, 463 Mass. 95, 113-114 (2012). Specifically, the
prosecutor said:

> "You've heard the defense say Timothy Lavin didn't
> live there. But there was no evidence to the
> contradictory [sic].
>
> "Think about what Officer Bossolt said. He went
> into the house, nine o'clock in the morning. Went
> upstairs. And there's Timothy Lavin in the master
> bedroom in bed.
>
> "If Timothy Lavin doesn't live at that house or
> doesn't stay at that house, then why is Timothy Lavin
> in someone's bed at nine o'clock in the morning? I
> suggest to you, based on what you heard, he stayed at
> that house." (Emphasis supplied.)

The defendant contends that, with the emphasized phrase above,
the prosecutor shifted the burden to the defendant requiring him
to testify or to present evidence countering the argument.[15]

"[A] 'prosecutor . . . cannot make statements that shift
the burden of proof from the Commonwealth to the defendant.'"
Johnson, 463 Mass. at 112, quoting Commonwealth v. Amirault, 404
Mass. 221, 240 (1989). "Such burden shifting typically arises
where a prosecutor . . . 'calls the jury's attention to the
defendant's failure to call a witness or witnesses, or . . . "to
contradict testimony."'" Johnson, supra, quoting Commonwealth
v. Tu Trinh, 458 Mass. 776, 787 (2011).

---

[15] We remind lawyers that one way to ensure that they stay
within the bounds of permissible argument during their closing
arguments would be to review the succinct statement of the law
regarding closing arguments found in Mass. G. Evid. § 1113(b)
(2018).

Although the phrase in question would have been better left unsaid, "we do not find that this transgression falls into the realm of prejudicial error."  Johnson, 463 Mass. at 113.  "[T]he prosecutor did not focus the jury's attention on a specific element missing from the defense, nor did the prosecutor otherwise suggest to the jury -- either implicitly or explicitly -- that the defendant had an affirmative duty to counter the Commonwealth's evidence against him."  Id.  A prosecutor is entitled to argue "the facts in evidence and the reasonable inferences that may be drawn therefrom."  Commonwealth v. Diaz, 478 Mass. 481, 487 (2017).

In addition, the judge twice informed the jury -- once before and once after the closing arguments -- that closing arguments are not evidence.  In her final charge, the judge emphasized that the Commonwealth has the burden of proof and that the "defendant is not required to call any witnesses or produce any evidence, since he's presumed to be innocent."  We presume the jury followed the judge's instructions.  See Commonwealth v. Andrade, 468 Mass. 543, 549 (2014).  After reviewing the prosecutor's remarks in the context of the whole argument, together with the evidence admitted at trial and the judge's instructions to the jury, we are satisfied that there was no prejudicial error.  See Diaz, 478 Mass. at 490.

Judgments affirmed.